*PHILIPS AND OTHERS *v.* WICKHAM AND OTHERS.

Where certain persons are invested by statute with discretionary powers, Chancery will not interfere to correct mere errors of judgment, if the powers conferred have not been illegally or unconscientiously exercised.

Whether at common law, civil and corporate officers are authorized to hold over after the expiration of the time for which they were elected, until successors are appointed. *Quære.*

Where the officers of a corporation are not authorized to hold over, if the corporators, without the presence of any officers, or any act to be done on their part, possess the power to assemble and choose officers to carry into effect the objects of the incorporation, a neglect to choose officers at the proper time will not work a dissolution of the corporation, but will merely suspend the exercise of the powers of the corporation until proper officers are chosen.[1]

But if the corporators have not the power to fill vacancies without the presence of their officers, or something to be done by them preparatory thereto, and such officers do not attend, or neglect to do the act requisite to the validity of the appointment, or there are no such officers, then, as the powers of the corporation cannot be revived, it is virtually dissolved.

The right of voting by proxy is not a general right, and the party who claims such right must show a special authority for that purpose.

The act of March 6, 1807, to raise moneys to drain the drowned lands in the county of Orange, gives the right of voting for commissioners under the act only to the persons who own lands in fee.

Where, in the election of corporate officers, no particular mode of proceeding is prescribed by law, if the wishes of corporators have been fairly expressed and the election was conducted in good faith, it will not be set aside on account of any informality in the manner of conducting the same.

BY the act of March 6th, 1807, entitled " An act to raise moneys to drain the drowned lands in the county of Orange," three inspectors were appointed to determine the number of acres of land belonging to each owner or proprietor which would be benefited by removing the obstructions in, and straightening the course of the river Wall Kill and the two streams falling into the same ; and to make a roll thereof containing a statement of the several lots so

August 28th

[1] See *Ex parte Heath,* 3 Hill, (N. Y.,) 42; 2 Kent, 259; *Trustees of Vernon* v. *Hills,* 6 Cow. 23; *McCall* v. *Bryam Man. Co.,* 6 Conn. 428; *All Saints Church* v. *Lovett,* 1 Hall, 191.

[*591]

to be benefited, with the number of acres in each, distinguishing whether the same was held in severalty, in common, in joint tenancy or co-parcenary, and the names of their respective owners or proprietors that might come to their knowledge; and to ascertain and determine the proportion that each *owner or proprietor should pay per acre of any sum of money to be raised for the purpose of draining such lands, according to the proportion of benefit which such owners or proprietors should eventually receive. Five commissioners were also named in the act to remove the obstructions, &c., for the purpose of draining the lands; with power to them and their sucessors, from time to time, to apportion such sums of money as might be necessary for that purpose, among the owners or proprietors, according to the roll made by the inspectors: and to raise the same by a sale of the lands, if not paid by the owners or proprietors. The powers of the commissioners named in the act were to cease on the first Tuesday in June, 1808; at which time the owners or proprietors of the said tract were to meet at the court house in Goshen, and elect a like number of commissioners to transact and manage the said business for one year; and the first Tuesday of June in every year thereafter was made the anniversary day for the owners or proprietors of the said tract to meet at the same place to elect a like number of commissioners to conduct and transact the business from year to year; which commissioners, during the year for which they were respectively elected, were to possess all the powers, perform all the duties, and keep regular accounts, and account as fully as the commissioners named in the act were authorized and required to do. Each of the owners or proprietors of the said tract who should be assessed on the roll for ten acres, was by the act to be entitled to one vote; and also one vote for every twenty acres he might own above ten and under four hundred acres; and an additional vote for every fifty acres he owned above four hundred acres.

A roll or list of the lands was made by the inspectors

and filed in conformity to the act; and commissioners were 1829.

Philips
v.
Wickham.
regularly elected from year to year until the first Tuesday in June, 1828; when, through inadvertence, no election was held, but the old commissioners continued to act.

Many attempts had been made, and about forty thousand dollars had been expended from time to time in endeavoring *to drain the drowned lands by the bed of the Wall Kill, [*592] but without success. In April, 1826, the legislature passed a supplementary act, authorizing the commissioners then in office and their successors, in the further prosecution of the draining of the said lands, to cut a canal from the river on the east side thereof, above Horse Island, on the most eligible route or course to the river, on the east side of G. N. Philip's mill pond, about three miles below. Previous to and after the passage of this last act, the owners and proprietors of the drowned lands were divided in opinion as to the best mode of draining them; some were in favor of doing it by means of the canal, and others by deepening and widening the bed of the Wall Kill at the outlet of the swamp. Many surveys and estimates were made to ascertain the practicability and expense of the two projects. At the last anniversary election for commissioners two tickets were formed, the one containing the names of those who were supposed to be in favor of draining by the canal route and the other of those who were in favor of draining by the outlet or bed of the Wall Kill; and two of the owners or proprietors were appointed inspectors of the election by the meeting. The persons in favor of the canal ticket had proxies from owners or proprietors, who were entitled to 94 votes; and McGregor, one of the complainants, who was in favor of the other ticket, had proxies for 26 votes. He also claimed to give 82 votes on a tract of 3,500 acres, which had belonged to his uncle in England, who died a few months previous seized of the same. McGregor likewise claimed a right to vote on 2,000 acres of 3,500, under an alleged agreement with his uncle to work it on shares for 20 years. The inspectors of the election decided that under

the act the owners or proprietors must vote in person, and were not authorized to appoint a proxy for that purpose. Those votes were accordingly rejected. They also decided against McGregor's right to vote upon the 3,500 acre tract or upon the 2,000 acres thereof. After all the persons present except two had voted, and after some of them had left the court house, McGregor snatched the hat which contained the votes from the inspectors, and refused to return it. The inspectors then *procured another hat, and called upon those who had not voted to hand in their votes, and then canvassed the votes thus given; by which it appeared that the defendants, except Gen. Wickham, whose name was on both tickets, had received 77 out of 79 votes. The inspectors thereupon declared the defendants, who composed the canal ticket, duly elected; and they made a certificate thereof, by which they declared them duly elected *by a majority of the votes in possession of the inspectors.* On a subsequent examination of the votes in the hat, which was returned by McGregor, it appeared that of all the votes given, both before and after the hat was taken from the possession of the inspectors, the lowest candidate on the canal ticket had 42 majority over the highest on the other ticket, and 62 over any other candidate on that ticket.

The defendants claimed to be duly elected, and authorized to act as commissioners. They had made contracts for a part of the work on the canal; and had also made an assessment of $26,500, to defray the expense of opening the canal, and were proceeding to collect the amount in the manner prescribed by the act, when McGregor and others filed their bill to restrain them from proceeding with the canal or to collect the assessment. The complainants alleged that the powers of the commissioners were at an end, by the neglect to elect in 1828; that they were not duly elected in 1829; and that they were wrongfully proceeding to drain the lands by the canal route, when that by the bed of the Wall Kill was the most proper and least expensive. An order having been granted for the defendants to show

cause why an injunction should not be granted, they now appeared to show cause and read their answer and several affidavits in opposition to the motion.

*A. Van Vechten* and *S. J. Wilkin* for the complainants.

*G. F. Tallman* and *B. F. Butler* for the defendants.

*THE CHANCELLOR :—By the answer of the defendants, which has been read in opposition to this motion, it pretty satisfactorily appears that the defendants are, in good faith, pursuing the course, in draining the drowned lands, which they believe to be the best, and the least expensive to the owners or proprietors. The statute has committed that question to their decision, and unless they are exercising the right illegally, or unconscientiously, this court ought not to interfere, although the Chancellor might differ with them in opinion. This is not the proper tribunal to correct mere errors of judgment in officers entrusted with discretionary powers. [*594]

But it is insisted, by the counsel for the complainants, that the power of the owners or proprietors of the drowned lands to elect commissioners and to proceed in the prosecution of this work, under the laws of 1807 and 1826, is at an end in consequence of their neglect to elect commissioners in 1828. And I shall now proceed to examine this question, without stopping to inquire whether the establishment of that proposition would furnish to the complainants any ground of relief in this court.

By the act of 1807, the commissioners, who were to be elected annually on the first Tuesday in June, were, during the year they should respectively be elected to act, to possess all the powers granted to the first commissioners. The peculiar phraseology of this statute seems to be inconsistent with the idea that they should hold over until others were elected in their stead. And were it not for the strong intimations to the contrary by some of the justices of the Su-

1829.

Philips
v.
Wickham.

[*595]

preme Court in *The People* v. *Runkle*, (9 John. Rep. 147,) and *The Trustees of Vernon Society* v. *Hills*, (6 Cowen's Rep. 23,) under the act respecting religious incorporations, the language of which appears to be equally clear, I should have supposed that the functions of these commissioners ceased at the end of the year for which they were elected. There are undoubtedly some common law officers who are to be elected or appointed periodically, but who, from the necessity of the case, continue to exercise their functions until others are *elected or appointed to fill their places. In the anonymous case, (12 Mod. Rep. 256,) it is said a constable is not discharged until his successor is appointed and sworn in; because the parish cannot be without an officer. There are many cases in the books relative to the magistrates of boroughs and other incorporated places; in some of which cases it has been decided that those officers held over, and in others that they did not. But I apprehend all these cases depended upon the peculiar provisions of their respective charters, and not upon any general principles of common law. In the case of *The Queen* v. *The Corporation of Durham*, (10 Mod. Rep. 146,) the court said the office of town clerk was an office for life, unless restrained by charter or proscription. And although by the custom of the borough he was to be elected annually, he might continue in office, and would do so, until another was chosen. But they said if the return had been that he was elected for one year only, his office would have expired at the end of the year, whether a successor had been appointed or not.

In the case of *The Corporation of Tregony*, (8 Mod. Rep. 127,) the mayor was to be elected annually, but there was an express provision in the charter that he should hold over until another was duly elected. But in the *Banbury case*, (10 Mod. Rep. 346,) where there could be no election without the presence of the old mayor, who was not authorized by the charter to hold over, and the day prescribed was permitted to pass without an election, the corporation

was held to be dissolved. I am not aware of any general principle of the common law which authorizes all civil, or corporate officers to hold over after the expiration of the time for which they were elected, until their places are supplied by others; and the numerous statutes both here and in England giving such authority in express terms, seem wholly inconsistent with any such common law principle. But the question I am about to consider is entirely distinct from that which relates to the right of the old commissioners to hold over. It is not necessary to express any opinion on that point; or if they had not the right to inquire whether their acts were void, or only voidable.

*The owners or proprietors of the drowned lands, under the act of 1807, are *quasi* a corporation; but the objects to be accomplished by the act can only be attained through the agency of the commissioners, who are to be elected annually. If the presence of the commissioners was necessary to the validity of an election, or any thing was to be done by them preparatory thereto, such as giving notice of the time and place, &c., there could be no election if the commissioners neglected to attend, or to give the requisite notice; *a fortiori* there could be no election if there were no commissioners in office; and in that case the powers granted by the act would be virtually at an end. But if the corporators have the power without the presence of their officers, or any act on their part, to assemble and choose officers to carry into effect the object of the law, their rights by a neglect to choose officers would be merely suspended. Although they may be forfeited by non-user or otherwise, they cannot be taken from them except by a direct proceeding, and judgment against them declaring the forfeiture.[1]

If a corporation consists of several integral parts, and some of those are gone, and the remaining parts have no

[1] *Slee* v. *Bloom*, 5 John. Ch. 366; S. C., 19 John. 456; *Brinckerhoof* v. *Brown*, 7 John Ch. 217; *Blake* v. *Hinkle*, 10 Yerg. 218.

1829.

Philips
v.
Wickham.

[*596]

power to supply the deficiency, the corporation is dissolved. As in the case in Rolle, (1 Roll. Abr. 514, I.,) where the corporation was to be composed of a certain number of brothers, and a certain number of sisters, and all the sisters were dead, and it was admitted that all grants and acts done by the brothers afterwards were void; for, after the sisters were dead, it was not a perfect corporation. But the case which is immediately afterwards stated by Rolle, shows that if the brothers had possessed the power to appoint other sisters in the place of those who were dead, the corporation might have been revived. So, Baron Comyn says, if a corporation refuses to continue the election of officers till all die who could make an election, the corporation is dissolved. (4 Com. Dig. 273, tit. *Franchises*, G. 4.)

The incapacity to receive or resuscitate the powers of a corporation may arise from three causes; 1st. The absence of the necessary officers who are required to be present, when the deficiency is supplied, or their incapacity or neglect to do some act which is requisite to the validity of the *appointment; 2d. The want of the necessary corporators who are required to unite in the appointment; and 3d. The want of the proper persons from whom the appointment is to be made. The case of *The Corporation of Banbury*, before referred to, appears to be one of the first description. And the case cited from Rolle, and that put by Chief Baron Comyn, as well as *The King* v. *Passmore*, (3 Term Rep. 199,) and *The Corporation* of *Maidstone*, and *The Borough of Teverton*, referred to in that case, all appear to belong to the two last classes of cases. The statute 11 Geo. 1, ch. 4, (15 Stat. at Large, 178,) has provided for the first class of cases; but the sixth section of the act expressly excludes the second class, and no provision is made for cases of the third class. The result of an examination of all the cases on this subject is the principle so ably and successfully contended for by Serjeant East, in *The King* v. *Passmore*, that if the corporators have the power in themselves to supply the deficiency in their body, their rights are not extin-

[*597]

guished, but only dormant. If however tnat power is
gone, and they cannot act until the deficiency is supplied,
the corporation is dissolved. In the language of Lord
Mansfield, this is not a forfeiture for non-user, but is a con-
sequence of law. " The corporation is dead, and not barely
asleep."

Applying these principles to the case now under consid-
eration, I am satisfied the powers of the owners or propri-
etors of the drowned lands, under the act of 1807, were
not extinguished by their neglect to elect commissioners in
1828, whether the old commissioners held over or other-
wise. The time and place for the annual meeting of the
owners or proprietors is fixed by law. No act is required
to be done by the commissioners, except to report their
proceedings for the last year to the meeting; and if there
were no commissioners, there could be no proceedings to
report. The commissioners are not even required to pre-
side at the meeting. There is nothing in the nature of the
duties to be performed which necessarily requires a contin-
ued succession of commissioners. The officers of towns
are required to be chosen by the people annually, at their
several town meetings; yet *if a part of those officers
should die before the expiration of the year, and the inhab-
itants of the town should, from any cause, neglect to hold
their annual town meeting, it would not prevent them from
supplying the vacancy at their next anniversary meeting
for that purpose. The officers thus chosen would possess
all the powers of their predecessors, in the same manner as
if there had been an uninterrupted succession.

It, therefore, becomes necessary to examine as to the
regularity of the election in 1829. The first question
which presents itself on this point is as to the right to vote
by proxy. This point does not necessarily arise in the
case, because from the bill and answer it appears that if all
the proxies had been admitted the defendants would have
had a still larger majority of the votes. The proxies actu-
ally held by them were 94, while those held by McGregor

1829.

Philips
v.
Wickham.

[*598]

were only 26. I lay out of question the 82 votes, which the latter claimed the right to give as the agent of his uncle, because he never had from him any specific power to vote on the property; and what is conclusive on that point, because the uncle had been dead for several months before the election, although the fact was not known at the time; and by the bill it appears McGregor had no authority whatever from the heirs or devisees. But as it may prevent future contest on this point, it may be proper to express an opinion thereon.

The right of voting by proxy is not a general right, and the party who claims it must show a special authority for that purpose. The only case in which it is allowable, at the common law, is by the peers of England, and that is said to be in virtue of a special permission of the king. And it is possible that it might be delegated in some cases by the by-laws of a corporation, where express authority was given to make such by-laws, regulating the manner of voting. I am not aware of any other case in which the right was ever claimed; and the express power which is generally given to the stockholders of moneyed and other private corporations is opposed to the claims in this case, where there is no express or implied power contained in the act. I, therefore, think the decision of the inspectors correct, in rejecting the votes offered under the proxies.

*The claim of McGregor to the vote on the 2,000 acres is equally untenable. If his name had been contained on the original assessment roll as the owner of this tract, it would have presented a different question. In that case the roll itself would have been the evidence of his right. But it is evident the legislature intended to give the right of voting to the owners of the lands in the ordinary acceptation of the term; which implies an ownership in fee. From the latter part of the eighth section of the act, it is evident the legislature intended to use the terms owner and proprietor in the same sense. The owner or proprietor is there authorized to give one vote for every ten acres assessed

to him on the roll, and one vote for every twenty acres he may own above that quantity, &c. The 2,000 acres in question were originally entered on the roll as the property of an individual, in fee. From him it has since been conveyed to the uncle of McGregor. Whether under such circumstances, if particular estates were carved out of the property, it would be necessary for the owners of the several estates to unite for the purpose of voting thereon, it is not necessary now to decide; but a mere tenant for years, or one who has taken the property on shares, and has no substantial interest therein, cannot exercise this right without the concurrence of the real owner of the property. The assessments are not a personal charge upon the owners or proprietors; and if not paid can only be collected by a sale of the land. The owner of the inheritance is therefore the person who is principally interested in the election of com missioners, as the expense of the improvements must fall on his estate in the premises.

By the bill it appears that the votes which were in the hat before it was taken by McGregor were restored to the inspectors, without addition or alteration. And by the answer and affidavits on the part of the defendants, it appears that they had a majority of all the votes including those taken by McGregor. Under such circumstances, it does not lie in his mouth to say the election was illegal or irregularly conducted. If he could not set up the irregularity, on a bill filed by him as the sole complainant, he cannot do it by uniting with others. If they wished to take advantage of such an *irregularity, they should have filed their bill and made him a party defendant. And in such a case if the complainants had succeeded, the court would have punished him by compelling him to pay the costs which had been incurred in consequence of his misconduct. But there was no irregularity in this case sufficient to avoid the election. The statute has prescribed no form to be observed, and the only questions are, whether all who had the right and wished to vote have been permitted to exer-

1829

Philips
v.
Wickham.

[*600]

cise that privilege, and whether the present commissioners were the choice of a majority of the voters. Of this there can be no doubt. The mode of conducting the election by the appointment of inspectors, and a public canvass of the votes in the presence of the electors, as heretofore pursued, was a proper mode of proceeding, and ought not to be departed from without cause. If a different course had been adopted without any sufficient reason, and there had been doubt as to the result or the fairness of the election, the same would have been set aside by the proper tribunal.

Although the inspectors may have erred in not commencing the canvass anew, after the outrage of McGregor, so that the election would be void if the number of votes previously taken had not been ascertained, yet there can be no suspicion of the *bona fides* of the transaction on their part. And the fact of the defendants' election, by the majority of the voters, being now ascertained, there can be no pretence for setting aside the election. As many of the electors had left the court house before the outrage was committed, the course pursued, as it resulted, showed more clearly the wishes of the majority than could have appeared appeared by commencing *de novo*.

A proceeding *de novo* after part of the electors had voted, and when they were absent, could only have been justified by the necessity of the case.

Having arrived at the conclusion that the power of the commissioners under the act is not at an end, by the neglect of the owners and proprietors to elect in 1828, and that the defendants were duly elected in 1829, it becomes unnecessary for me to examine the question as to the right of this court to stay the proceedings of the commissioners if they *were unduly elected; or as to the propriety of granting a preliminary injunction under the circumstances stated in the bill.

The rule to show cause why an injunction should not issue must be discharged with costs to be paid by the complainants.