WESTERN UNION TEL. CO. *v.* MAYOR OF THE CITY OF NEW YORK *et al.*

(*Circuit Court, S. D. New York.* April 15, 1889.)

1. CONSTITUTIONAL LAW—FEDERAL AGENCIES—INTERSTATE COMMERCE—POLICE REGULATIONS.

Laws N. Y. 1884, c. 534; Id. 1885, c. 499, requiring all electric wires in any city having a population of 500,000 or more to be placed under the surface of the streets, is valid as a police regulation, as to a telegraph company which has accepted the provisions of act Cong. July 24, 1866, and which thereby became, as to government business, an agency of the general government, and entitled to construct, etc., lines of telegraph over and along any post-road, etc., and which is an instrument of interstate commerce. The statute does not infringe the power of congress to regulate commerce, or the exemption of the agencies of the federal government from state control.

2. SAME—SPECIAL PRIVILEGES.

The board of commissioners of electrical subways, created by the act of 1885, made a contract with a subway company to lay subways for the use of all electrical companies; authorizing the subway company to charge a rental for the use of the subways; reserving to the commissioners such control over the subways as was calculated to secure to all companies reasonable facilities and protection; and providing that all companies using the subways should own, control, etc., their conductors, and that the commissioners would use all lawful means to compel all companies to use the subways and pay a fair rental therefor. *Held,* that Laws 1887, c. 716, ratifying the contract, was none the less a police regulation because of the special privileges given to the subway company.

3. SAME—DUE PROCESS OF LAW.

Neither is the statute of 1887 invalid as a confiscation of property rights by depriving companies owning electric wires of their easements for the benefit of the subway company.

4. SAME—MONOPOLIES AND PRIVILEGES.

As there is nothing in the contract precluding the commissioners from building subways or entering into contracts with other companies for building them, and as it extends only to such subways as the commissioners shall direct the company to build, and provides that nothing in it shall be construed as granting any exclusive privilege or franchise, the act does not violate Const. N. Y. art. 3, § 16, prohibiting any local bill granting to any corporation any exclusive privilege, immunity, or franchise.

5. SAME—FEDERAL PRIVILEGE.

But there is such doubt as to the validity of the statutes to the extent that they permit the telegraph company to be deprived of its right to maintain its wires on the structures of an elevated railroad, which is a post-road, that an injunction against any interference with the wires thereon should be granted until the question can be passed on by the court of last resort, the maintenance of wires thereon not being attended with any public inconvenience.

6. EQUITY—JURISDICTION—PUBLIC AUTHORITIES.

Where the public authorities are not acting *mala fide,* the exercise of their discretion will not be reviewed in a court of equity on the allegation of the telegraph company that they are attempting to compel it to place its wires in insufficient and defective subways.

In Equity.

Action by the Western Union Telegraph Company against the mayor of the city of New York and others.

*Wager Swayne, George H. Fearons,* and *Rush Taggart,* for complainant. *John M. Bowers* and *David J. Dean,* for defendants.

WALLACE, J. This case presents the general question whether certain acts of the municipal authorities of the city of New York, respecting

matters of grave local concern, done or about to be done pursuant to powers devolved upon them by the legislature of the state, are such an invasion of the paramount authority of the national government as to render them unwarranted.    The mere statement of this proposition shows that the complainant has properly invoked the jurisdiction of this court, and has a right to rely upon its interposition by injunction, if the acts of the defendants are thus unwarranted, are injurious to the complainant, and are of a nature remediable by courts of equity.    Telegraph companies that have accepted the restrictions and obligations of the law of congress of July 24, 1866, (title 65, Rev. St. U. S.,) become, as to government business, agencies of the general government, and are given the privilege to "construct, maintain, and operate" lines of telegraph over and along any post-road of the United States, but not so as to interfere with "the ordinary travel" on such roads.    All the streets of the city of New York are post-roads, because they are letter carrier routes; and all railroads are post-roads.    Rev. St. § 3964.    The complainant accepted the provisions of this law of congress in 1867.    A telegraph company occupies the same relation to commerce, as a carrier of messages, that a railroad company does as a carrier of goods.    Both companies are instruments of commerce, and their business is commerce itself.    Telegraph companies are subject to the regulating power of congress in respect to their foreign and interstate commerce, and this power resides exclusively in congress.    The complainant has long been engaged in interstate and foreign commerce.    In the course of its operations the complainant has lawfully erected its poles, and strung its wires, in and along many of the streets of New York city, which, as has been stated, are post-roads of the United States; and it has also put up and now maintains over and along other streets a number of wires upon the structures of the Manhattan Railway Company, an elevated railway of the city, also a post-road, pursuant to a lease from the railway company.    The defendants, assuming to proceed by the sanction and mandate of certain acts of the state legislature, have compelled the complainant to remove its poles and wires from some of the streets, and have notified it to remove them from other streets, and to remove its wires from the structures of the elevated railway; and they propose, if the complainant fails to comply with these requirements, to remove the poles and wires themselves.    Under these circumstances the complainant asks this court to examine the authority under which this destruction of its property is threatened, and determine whether there is any justification in law for acts which apparently invade its privilege to maintain and operate its lines upon the post-roads of the United States, interfere with its operations as a government agent, and interrupt and impede the discharge of its functions as an instrument of interstate and foreign commerce.

It is not open to discussion that the complainant is protected by the national authority against any encroachment under state authority upon the rights and immunities expressly granted to it by the act of congress, or which it enjoys in its dual capacity as an agent of the general government and an instrument of interstate and foreign commerce.    Speak-

ing of the privilege conferred upon telegraph companies by the act of congress, the supreme court of the United States, in *Telegraph Co.* v. *Telegraph Co.*, 96 U. S. 1, 11, used this language:

"It gives no foreign corporation the right to enter upon private property without the consent of the owner, and erect necessary structures for its business; but it does provide that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post-roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges."

Indeed, the language of one of the very latest opinions of that court upon the question of the power of the state to interfere with the right of a telegraph company to maintain and operate its lines along a post-road applies to the specific facts of this case, and, if literally interpreted, would control the present decision. The question before the court was as to the power of a state to tax the real and personal property, within the state, of a telegraph company which had accepted the provisions of the act of congress; but the court, while holding that the privilege granted did not exempt the telegraph company from such taxation, said:

"While the state could not interfere by any specific statute to prevent a corporation from placing its lines along these post-roads, or stop the use of them after they were placed there, nevertheless the company, receiving the benefit of the laws of the state for the protection of its property and its rights, is liable to be taxed upon its real or personal property as any other person would be." *Telegraph Co.* v. *Massachusetts,* 125 U. S. 530, 548, 8 Sup. Ct. Rep. 961.

Concerning the immunity of the complainant, as an agent of the general government for the transaction of government business, from an unwarranted interference through state legislation with its operations, the doctrine first enunciated in *McCulloch* v. *State,* 4 Wheat. 316, and reiterated in subsequent adjudications whenever the question has arisen, is familiar, that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the agencies of the federal government, and they are exempted from the effect of state legislation, so far as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve the government. Respecting the position of the complainant as an instrument of interstate and foreign commerce, it suffices to quote the language of the supreme court in one of the more recent cases in which the question was considered:

"Notwithstanding what is there said, [in previous judgments,] this court holds now, and has never consciously held otherwise, that a statute of the state intended to regulate, or to tax, or to impose any other restriction upon the transmission of persons or property or telegraph messages from one state to another, is not within that class of legislation which the states may enact in the absence of legislation by congress; and that such statutes are void even as to that part of such transmission which may be within the state." *Railway Co.* v. *Illinois,* 118 U. S. 557, 7 Sup. Ct. Rep. 4.

Nevertheless persons and corporations enjoying grants and privileges from the United States, exercising federal agencies, and engaged in in-

terstate commerce, are not beyond the operation of the laws of the state in which they reside or carry on their business; and it is only when these laws incapacitate or unreasonably impede them in the exercise of their federal privileges or duties, and transcend the powers which each state possesses over its purely domestic affairs, whether of police or internal commerce, that they invade the national jurisdiction.   This doctrine is well expressed in the words of the supreme court in *Patterson* v. *Kentucky*, 97 U. S. 501, 504, as follows:

"By the settled doctrines of this court the police power extends at least to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights.  State legislation, strictly and legitimately for police purposes, does not, in the sense of the constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government."

The statutes which the defendants are proceeding to enforce unquestionably belong in the category of police regulations, the power to establish which has been left to the individual states. · But statutes of this class may sometimes trench upon the federal jurisdiction; and when their provisions extend beyond a just regulation of rights for the public good, and unreasonably abridge or burden the privileges which the national authority conserves, they cease to be operative.   The state, when providing by legislation for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the constitution of the United States, and may not violate rights secured or guarantied by that instrument, or interfere with the execution of the powers confided to the general government.   *Mugler* v. *Kansas*, 123 U. S. 623, 663, 8 Sup. Ct. Rep. 273.   In *Morgan* v. *Louisiana*, 118 U. S. 462, 6 Sup. Ct. Rep. 1114, the supreme court say:

"In all cases of this kind it has been repeatedly held that when a question is raised whether the state statute is a just exercise of state power, or is intended by roundabout means to invade the domain of federal authority this court will look into the operation and effect of the statute to discern its purpose."

And again the court say, (page 464:)

"For, while it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations and an exercise of the police power, it has been said more than once in this court that, even where such powers are so exercised as to come within the domain of federal authority, as defined by the constitution, the latter must prevail."

Applying these principles, it is now to be considered whether the statutes in question, or the acts of the defendants under them, can be defended under the state power of police regulation, or whether what is proposed to be done exceeds in any respect the boundaries of legitimate regulation, and encroaches upon the rights of the complainant founded upon the law of congress, or incidental to the nature of its commerce. By chapter 534 of the Laws of 1884 it was enacted, in effect, that all electric wires and cables in any city having a population of 500,000 or over should be placed under the surface of the streets, and the persons controlling the same should by a specified date have the same removed

from the surface; and the local governments of such cities were authorized to remove such wires and cables wherever found above ground in case the owner failed to comply with the provisions of the act. By chapter 499 of the Laws of 1885 a board of commissioners of electrical subways was created for such cities, and charged with the duty of enforcing the provisions of the previous act, and power was conferred upon them to devise and make ready a general plan of underground conduits, and to compel all companies operating electric wires to use the subways so prepared. They were also empowered to allow the wires to remain above ground when compatible with the public interest. In April, 1887, the commissioners for the city of New York entered into a contract with the Consolidated Telegraph & Electric Subway Company to lay subways in the city of New York for use of all the electrical companies when furnished with plans and specifications therefor by the commissioners. This contract authorized the subway company to charge a rental for the use of the subways, and contained provisions reserving such a control in the commissioners over them as was calculated to secure to all companies desiring to use them reasonable facilities and protection. It contained a provision by which all companies occupying space in the subways were to own their own conductors, and have the full management and control thereof, subject to the rights of all other occupants, and to such reasonable rules and regulations as should be made by the commissioners. It also contained a stipulation that the commissioners would use all lawful means to compel all companies to place their conductors in the subways, and pay a fair rental for the use. By chapter 716 of the Laws of 1887 the legislature ratified and confirmed the contract made between the commissioners and the subway corporation; and the act provided that if at any time the agreement should be found inoperative or ineffectual for the accomplishment of its just purposes the commissioners were empowered to make such new or different contracts with the same or other parties as might be reasonably necessary. The act also contained a provision authorizing an application to be made to the courts for a *mandamus* whenever it appears that the subway corporation or the commissioners have failed to furnish just and equal facilities to any company operating electrical conductors upon just and reasonable terms. By sections 3 and 4 it declared as follows:

"Sec. 3. Whenever, in the opinion of the board hereinbefore constituted, in any street or locality of said city a sufficient construction of conduits or subways underground shall be made ready under the provisions of this act, reference being had to the general direction and vicinity of the electrical conductors then in use overhead, the said board shall notify the owners or operators of the electrical conductors above ground in such street or locality to make such electrical connections in said street or through other streets, localities, or parts of the city with such underground conduits or subways, so specified, as shall be determined by the said board, and to remove poles, wires, or other electrical conductors above ground, and their supporting fixtures or other devices, from said street and locality within ninety days after notice to such effect shall be given. This provision is made a police regulation in and for the city of New York, and in case the several owners or operators of such wires, and the owners of such poles, fixtures, or devices,

shall not cause them to be removed from such street, or locality as required by such notice, it shall be the duty of the commissioner of public works of said city to cause the same to be removed forthwith by the bureau of incumbrances, upon the written order of the mayor of said city to that effect. Sec. 4. It shall be unlawful, after the passage of this act, for any corporation or individual to take up the pavements of the streets of said city, or to excavate in any of said streets for the purpose of laying underground any electrical conductors, unless a permit, in writing, therefor shall have been first obtained from the said board or its predecessors; and, except with such permission, no electrical conductors, poles, or other figures or devices therefor, nor any wires, shall hereafter be continued, constructed, erected, or maintained, or strung above ground in any part of said city.   The said board of electrical control may establish, and from time to time may alter, add to, or amend, all proper and necessary rules, regulations, and provisions for the manner of use and management of the electrical conductors, and of the conduits or subways therefor constructed or contemplated under the provisions of this act, or of any act herein mentioned."

It was said of the acts of 1884 and 1885, by the court of appeals, (*People* v. *Squire*, 107 N. Y. 593,) 14 N. E. Rep. 820, that they "sprung out of a great evil, which in recent times has grown up and afflicted large cities by the multiplication of rival and competing companies, organized for the purpose of distributing light, heat, water, the transportation of freight and passengers, and facilitating communication between distant points, and which require in their enterprises the occupation of not only the surface and air above the streets, but indefinite space under ground.   This evil had become so great that every large city was covered with a network of cables and wires attached to poles, houses, buildings, and elevated structures, bringing danger, inconvenience, and annoyance to the public.   *   *   *   The necessity of a remedy for these public annoyances had long been felt, and it finally culminated in the enactment of the several statutes referred to.   These statutes were obviously intended to restrain and control, as far as practicable, the evils alluded to, by requiring all such wires to be placed under ground in such cities, and be subject to the control and supervision of local officers who could reconcile and harmonize the claims of conflicting companies and obviate in some degree the evils which had grown to be almost, if not quite, intolerable to the public."

The act of 1887, by validating the contract between the commissioners and subway company, in effect incorporated the terms of that contract into its provisions.   But the statute is none the less an exercise of the police power, and within the competency of the legislature, because of the special privileges given to the subway company.

It has been urged that, in effect, this statute confiscates property rights of the complainant and other companies owning electric wires, by depriving them of their easements for the benefit of the subway company, and therefore cannot be sustained as an exercise of police power.   But in the *Slaughter-House Cases*, 16 Wall. 36, the supreme court upheld a statute far more obnoxious to these objections than the present act.   In that case the statute under consideration was one passed by the legislature of Louisiana, granting to a corporation created by it the exclusive right for 25 years to have and maintain slaughter-houses, landings, and yards for inclosing cattle intended for sale or slaughter within certain parishes of that state, including the city of New Orleans; prohibiting all

other persons from building, keeping, or having slaughter-houses, land-ings, or yards for cattle intended for sale or slaughter; requiring that all cattle intended for sale or slaughter should be brought to the yards and slaughter-houses of the corporation; and authorizing the corporation to exact certain fees for each animal slaughtered. This act was sustained as a police regulation by the court.

It has also been objected to the act of 1887 that it contravenes section 16, art. 3, of the state constitution, prohibiting the legislature from pass-ing any local bill granting to any corporation any exclusive privilege, immunity, or franchise. Without intending to intimate that such a question is properly to be considered by this court in the present case, it is proper to say that the objection seems to be without substance. There is nothing in the contract with the subway company which pre-cludes the commissioners from building subways, or entering into con-tracts with other companies for building them, similar to the one made with the subway company. The contract only extends to such subways as the commissioners shall direct the subway company to build, and it provides in express terms that nothing in it shall be construed as grant-ing to the subway company any exclusive privilege or franchise.

The question, then, is whether or not these statutes unreasonably abridge or burden privileges and immunities which the complainant de-rives from the general government. In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect; and these statutes are to be judged by the extent of the powers which they confer, and treated as police regulations only to the extent to which their operation can be justified by the police power of the state. Undoubtedly, in carrying them into effect, the complainant will be sub-jected to great expense, the temporary interruption of its business, and possibly to permanent inconvenience and loss in conducting its business. But, after all, the question is merely one of the reasonableness of the regulation, and whether the losses and inconveniences to which the com-plainant may be subjected are not such as may justly be exacted of every citizen or property owner for the common good. It is a settled princi-ple, "growing out of the nature of well-ordered society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." *Com.* v. *Alger,* 7 Cush. 53. This liability is quite irrespective of the source or charac-ter of his title. Thus the owner of a patent for an invention—property which is created and only exists by force of the statutes of the United States—can only enjoy his property "subject to the complete and salu-tary power—with which the states have never parted—of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few." *Patterson* v. *Kentucky,* 97 U. S. 501. The subordination of the property rights of the owner to the just exercise of the police power of the state is as complete as it is to the taxing power of the state, which

requires him to contribute his proportion of the burden of taxation. Indeed, the two powers of regulation are co-ordinate and co-extensive, and the limitations upon one may well be ascertained by the limitations upon the other.   As is said by the court in *Kidd* v. *Pearson*, 128 U. S. 1, 9 Sup. Ct. Rep. 6:

"The police power of a state is as broad and plenary as its taxing power; and property within the state is subject to the operations of the former so long as it is within the regulating restrictions of the latter."

And in a very recent adjudication it has been stated that the property within the state of a telegraph company, privileged under the law of congress to maintain and operate its lines over the post-roads of the United States, is subject to the exercise of these two powers.   In *Telegraph Co.* v. *Massachusetts*, 125 U. S. 548, 8 Sup. Ct. Rep. 961, the court say:

"It never could have been intended by the congress of the United States, in conferring upon a corporation of one state the authority to enter the territory of any other state and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the state to which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support."

It is not apparent how the regulation proposed impairs in any just sense the privilege granted to the complainant by the law of congress. The privilege to maintain telegraph wires "over and along" post-roads is not to be construed so literally as to exclude regulations by the state respecting location and mode of construction and maintenance, which the public interests demand; but is to be construed so as to give effect to the meaning of congress, which was to grant an easement that would afford telegraph companies all necessary facilities, and which to that extent should be beyond the reach of hostile legislation by the states. Thus interpreted, the grant is no more invaded when the regulation requires the wires to be placed in conduits under ground than it would be if they were required to be placed in conduits along the surface of the streets; and when this becomes necessary for the comfort and safety of the community such a regulation is as legitimate as one would be prescribing that the poles should be of a uniform or designated height, or should be located at given distances apart, or at designated places along the streets.   Regulations of an analogous character, and entailing nearly as onerous and expensive burdens upon the property owner, are those by which railroad companies have been compelled to maintain fences and cattle-guards; and in the instances where the competency of such regulations has been considered by the supreme court it seems never to have been suggested that they were an unreasonable interference with the post-roads of the United States, or the agencies of the federal government, or with the power of congress to regulate commerce.   *Railway Co.* v. *Humes*, 115 U. S. 512, 6 Sup. Ct. Rep. 110; *Railroad Co.* v. *Beckwith*, 9 Sup. Ct. Rep. 207.   The legislation in question does not contemplate any regulation which is not practically feasible; but what is prescribed, if judiciously enforced, can be complied with by the companies operating

electric wires without serious detriment to their instrumentalities. The expense, and the temporary or occasional interruptions and inconveniences which are incident to the scheme proposed, constitute the extent of their sacrifice for the general comfort and convenience. Such legislation does not infringe upon the power of congress to regulate commerce, or upon the exemption of the agencies of the general government from state control.

The reports of the decisions of the supreme court abound with cases illustrating the rule that all local arrangements and regulations respecting highways, railroads, bridges, canals, ferries, and wharves within the state, their location, supervision, and details of management, though materially affecting commerce, both internal and external, and thereby incidentally operating measurably upon the transaction of interstate commerce, are within the power and jurisdiction of the several states. When the regulations do not act upon the commerce through the local instruments to be employed after coming within the state, but directly upon business as it comes into the state from without, or goes out from within, they are nugatory; otherwise they are valid. The most frequent illustrations are found in the exercise of the taxing power of the state; and the distinction has always been observed, though in many cases the line has seemed obscure, between taxation or regulation of commerce itself, and of subjects which are merely auxiliary. So with respect to state legislation which touches the instrumentalities of federal agencies. These agencies are exempt from state control by police regulation, or by the exercise of the taxing power, so far only as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve the government. *Bank* v. *Com.*, 9 Wall. 353; *Railroad Co.* v. *Peniston*, 18 Wall. 5.

What has thus been said of these statutes has been confined to their effect as authorizing the municipal authorities to compel complainant to remove its poles and wires from the streets to the subways. There is serious doubt whether the powers conferred by these statutes are not nugatory to the extent that they permit the complainant to be deprived of its right to maintain and operate its wires upon the structures of the elevated railway. That railway is an independent post-road of the United States, in legal contemplation, carved out of the streets upon which its structures are erected; and state legislation, under whatever power it may be classified, is impotent to destroy the privilege given by the act of congress. The power to remove the wires altogether from these structures, and to refuse to permit them to be kept there under any circumstances, is not regulation, but is equivalent to a complete denial of the privilege. Such a power would seem to be as obnoxious to the federal privilege as that which was attempted to be exercised by the state of Florida in the statute considered by the supreme court in the *Case of Telegraph Co.*, 96 U. S. 1. The effect of that statute was to preclude a telegraph company from constructing and operating its lines along the railroad of the Alabama & Florida Railroad Company, and to that extent the courts held it to be inoperative. Whether this conclusion is

sound or not, inasmuch as the maintenance of the wires of the complainant upon the structures of the railway company is not at present attended with any public inconvenience, and the question is one of sufficient novelty and importance to be considered by the court of last resort, any doubt should be resolved in favor of the complainant, for the purpose of its temporary protection.

It is alleged by the complainant that in proceeding to enforce these statutes the defendants are attempting to compel it to place its wires in some of the subways of the subway company which are insufficient and defective to a degree that will seriously affect the workings of its wires. It is needless to say that the defendants deny this averment. However the fact may be, the defendants are not acting *mala fide*, and as they are exercising discretionary powers as public officers, which are lawful within the scope of their authority, the exercise of that discretion in good faith will not be reviewed by a court of equity, and their determination is conclusive. The well-settled doctrine concerning the exercise of duties by public officers is that, so long as they confine themselves to such as are confided to them by law, the court will not interfere to see whether they are acting wisely or judiciously. *Gaines* v. *Thompson*, 7 Wall. 347; *Philips* v. *Wickham*, 1 Paige, 590; High, Inj. § 1240; 2 Story, Eq. Jur. (13th Ed.) § 955. An order will be entered denying an injunction, and vacating the stay heretofore granted as respects the removal of the complainant's poles and wires from the streets, and granting an injunction against any interference by the defendants with the complainant's use of the structures of the Manhattan Railroad Company for operating and maintaining its lines.