

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

GERALD C. MANN
XXXXXXXXXXON
ATTORNEY GENERAL

Honorable C. R. McNamee, Director
Rate Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

Opinion No. O-3118

Re: (a) Transportation of cotton owned by Commodity Credit Corporation, United States Department of Agriculture, by a common or contract carrier, intrastate, for special rates arrived at by contract and in disregard of the published tariff prescribed by the Railroad Commission of Texas.

(b) Transportation of cotton held and possessed by Commodity Credit Corporation, United States Department of Agriculture, under loan agreement not yet in default and to which title remains in the producer, on the basis of rates fixed by contract between the parties rather than at the published rates prescribed by the Railroad Commission for intrastate traffic.

Your letter of February 3, 1941, submits for our opinion the following question, which has been presented to you by Mr. C. G. Rausch, Traffic Manager, Cotton Division, Commodity Corporation, United States Department of Agriculture:

"'In transporting U. S. Government Cotton must the motor truck adhere to its published rates or can a common or contract carrier make special rates on this traffic for us?'"

In connection with the foregoing question, copy of attached letter to you from Mr. O. G. Rausch, gives the following information:

"In response to the questions propounded in Mr. McNamee's letter previously referred to, will say that all of the cotton shipped from

one location to another in the State of Texas
is now owned outright by this Corporation, but
in some instances is cotton placed in the loan
by the owner of such cotton as security for the
funds advanced by the Corporation to the owner
of such cotton.  Of course this Corporation
holds temporary title to such cotton until the
loan agreements have been complied with or are
in default; therefore, the cotton may or may
not at some future date become the outright prop-
erty of the Corporation.

"Answering your further inquiry, usually
the cotton shipped by us moves under documents
showing the Commodity Credit Corporation as both
the shipper and the receiver of the cotton, and
as receiver in care of the facility in which
the cotton will be stored on delivery."

The business of transporting persons and property from
one point in Texas to another by common or contract carrier,
is a business impressed or affected with a public use of inter-
est, so as to become subject, under the reserved police power
of the State, to legislative control in all respects necessary
to protect the public against danger, injustice, and opression,
including the fixing and regulation of rates.  In general, the
Legislature may make all such reasonable regulations as it may
deem necessary for the protection of the public in its rela-
tions with those who carry on a business affected with the
public interest.  6 Ruling Case Law 228; 13 C. J. S. pages 44-
45, 631-632.  To the Railroad Commission, as the duly consti-
tuted agency of the State for this purpose, the Legislature
has delegated the duty of fixing maximum rates for intrastate
transportation services of common or contract carriers, to
protect the public from excessive charges and from unjust dis-
crimination.

But the first phase of your question does not present
a controversy between a common or contract carrier and a ship-
per of cotton in the ordinary channels of commerce, i.e. the
public, so as to require the protection of the police power
in the above respect.  The Commodity Credit Corporation, the
admitted owner and shipper of the cotton under the first
phase of your question, is undoubtedly an agency or instrumen-
tality of the United States, being so declared by Congress in
15 U. S. C. A., Section 713, providing:

"Notwithstanding any other provision of law,
Commodity Credit Corporation, a corporation or-
ganized under the laws of the State of Delaware

as an agency of the United States pursuant to the executive order of the President of October 16, 1933, shall continue, until the close of business of June 30, 1941, or such earlier date as may be fixed by the President by executive order, to be an agency of the United States."

Under Title 5, U. S. C. A., Section 133s, Reorganization Plan No. 1, Part IV, Section 401, the Commodity Credit Corporation, its functions and activities, property and personnel, was transferred to the Department of Agriculture, a duly constituted, executive department of the Government, to be administered under the general direction and supervision of the Secretary of Agriculture.

The status of the Commodity Credit Corporation being thus established as an outright and direct agency or instrumentality of the Federal Government, created for the purpose of discharging the constitutional functions of said Government under its Farm Relief Program, it is for us to determine whether or not the admitted authority of the Railroad Commission of Texas to fix and promulgate rates for the transportation of persons or property, intrastate, under the police power residing in the Legislature, would, in the instant case, impose such a burden or restriction upon such agency or instrumentality, as to contravene the Federal Constitution and the powers which stem therefrom.

The Constitution of the United States does not contain any express limitation on the police power of the states as such, and does not limit a state's power to make all regulations reasonably necessary to advance or secure the general welfare of the people residing within such state. However, Article VI, Section 2, of the Constitution of the United States, expressly declares that the Constitution itself and the Federal laws and treaties made in pursuance thereof, are the supreme law of the land. The Federal Government, therefore, is paramount within the scope of the powers conferred upon it by the Constitution, and a state must exercise its police power subject to the constitutional limitations. 16 C. J. S. 565.

The rule is stated in Western Union Telegraph Co. v. Mayor of the City of New York, et al, 38 Fed. 552, as follows:

"The statutes which the defendants are proceeding to enforce unquestionably belong in the category of police regulations, the power to establish which has been left to the individual states. But statutes of this class may sometimes trench upon the federal jurisdiction; and when

their provisions extend beyond a just reg-
ulation of right for the public good, and unrea-
sonably abridge or burden the privileges which
the national authority conserves, they cease to
be operative.  The state, when providing by leg-
islation for the protection of the public health,
the public morals, or the public safety, is sub-
ject to the paramount authority of the constitu-
tion of the United States, and may not violate
rights secured or guaranteed by that instrument,
or interfere with the execution of the powers
confided to the general government.  Mugler v.
Kansas, 123 U. S. 623, 663, 8 Sup. Ct. Rep. 273.
In Morgan v. Louisiana, 118 U. S. 462, 6 Sup. Ct.
Rep. 1114, the supreme court say:

"'In all cases of this kind it has been re-
peatedly held that when a question is raised
whether the state statute is a just exercise of
state power, or is intended by roundabout means
to invade the domain of federal authority this
court will look into the operation and effect of
the statute to discern its purpose.'

"And again the court say, (page 464:)

"'For, while it may be a police power in
the sense that all provisions for the health,
comfort, and security of the citizens are police
regulations and an exercise of the police power,
it has been said more than once in this court
that, even where such powers are so exercised
as to come within the domain of federal author-
ity, as defined by the constitution, the latter
must prevail.'"

Under the program enacted by Congress for maintaining
a fixed percentage of parity price for certain farm products,
cotton which the producer or grower fails, within the terms
and manner required, to redeem from the loan made to him by
the Commodity Credit Corporation, becomes the absolute proper-
ty of the Federal Government, by and through its duly estab-
lished agency, subject to such sale or other disposition as
would follow full and complete title.  The transportation of
such cotton from point to point within this State is certain-
ly reasonably necessary to the proper sale or handling of such
cotton, and the costs of this transportation is a substantial
item in determining the net price which will be realized by
the Government in the sale of such cotton.  For the State of
Texas, through its Railroad Commission, to require the Federal

Government to pay the published maximum rates on intrastate shipments, when presumptively, common and contract carriers stood willing and able to give more advantageous rates, would constitute, in the amount of such differential, a direct burden upon an agency or Department of the Federal Government. There being no reason to support such added burden, in the protection of the public from extortionate charges and unjust discrimination, we think such burden cannot be constitutionally exacted. The sale, transportation and disposition of cotton owned by the Government through the Commodity Credit Corporation, is within the exclusive scope of Federal power and it is accordingly our answer to the first phase of your question that the police power of the State, in the field of rate-making and fixing, has no application here but must be subordinate to the implied powers of the Federal Government, arising under the Constitution of the United States.

This conclusion may be easily distinguished from that reached by this Department in Conference Opinion 3106 to Honorable Homer Garrison, Jr., Director, Department of Public Safety, Austin, Texas, of date November 25, 1940, upholding, as to vehicles operated by employees of the Soil Conservation Service of the United States Department of Agriculture, the provisions of state law prohibiting the operation of over-length, over-height, over-width and over-weight vehicles, upon the public highways of this State. The exercise of the police power in the opinion referred to was reasonably designed to safeguard the lives, safety and well-being of the inhabitants of the State and to protect the highways of the State from damages and injury, while in the instant discussion the police power sought to be exercised bears no reasonable relation to the health, safety and well-being of the people or preservation of the property of the State of Texas. In the first instance the burden visited upon a Federal agency by the police power is reasonable and constitutional while in the latter it is not.

But the same principles of constitutional law will not be applicable to the second phase of your inquiry involving the authority of common or contract carriers to transport, intrastate, at rates other than those fixed by the Railroad Commission, cotton in the custody and possession of the Commodity Credit Corporation, as security for loans thereon to the producer, under the cotton parity price program, but to which absolute title has not ripened in such Corporation by default of such producer. In this situation, the title to the cotton remains in the producer, subject to redemption or release of the lien thereon by timely payment of the loan or advance made by the Government, plus accrued handling costs and charges. Title to the cotton cannot be said to rest in the Government

until the expiration of the date fixed by law for such payment and redemption by the producer. Hence, the producer and not the Government is the actual shipper.

The results which follow from this distinction are stated in the case of Sands v. Calmar S. S. Corporation, 296 N. Y. Sup. 590, involving the validity of the contract of a common carrier by water to transport goods sold to the United States, under acts of Congress permitting rate reductions for the Government:

"In construing the provision in connection with the Interstate Commerce Act, it has been held improper to permit the benefit of special rates on government material to accrue to anyone other than the government itself. Havens & Co. v. Chicago & N. W. Ry. Co. 20, I.C.C. 156; Nashville, C. & St. L. Ry. v. State of Tennessee, 262 U. S. 318, 43 S. Ct. 583, 67 L. Ed. 999; 25 Op. Attys. Gen. 408.

"In the opinion of the Attorney General (supra), it was stated in substance that the Interstate Commerce Act is not violated by reduction of freight rates, authorized by Section 22 on materials and machinery used by the United States, or by parties contracting with them, for work upon irrigation systems, provided the government receives the whole benefit of the reduced rate or concession; but it is violated if the contractor receives any portion of such benefit.

"I am forced to conclude that it is the plaintiff shipper who would benefit by any reduction in rates, and not the government. By obtaining such a concession the plaintiff would be benefitted, in that it would find itself able to bid more advantageously than other prospective bidders not receiving such special rates. Therein lies the vice of plaintiff's contention. All of these various acts aim to curtail the vicious practice resulting from discrimination. Discrimination would certainly result if a particular shipper, whether by inadvertance or design, is accorded an advantage which is not available to others."

It is therefore, our answer to the second phase of your inquiry, that the carriage or transportation of such cot-

ton by a common or contract carrier at rates less than those fixed and published by the Railroad Commission of Texas, would constitute an undue and reasonable discrimination in favor of the individual shipper, to the injury and detriment of competing shippers. The police power of the State, reasonably exercised in the fixing of rates for the protection of the public, will not operate to unconstitutionally burden an agency or Department of the Federal Government, and the rates fixed thereunder by the Railroad Commission of Texas must be fully observed.

Trusting the foregoing fully answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By s/Pat M. Neff, Jr.
Pat M. Neff, Jr.
Assistant

PMN:LM:wc

APPROVED MAY 9, 1941
s/Grover Sellers
FIRST ASSISTANT
ATTORNEY GENERAL

Approved Opinion Committee By_s/BWB_Chairman