Union Water Co. *v.* Kean.

52  111
52  261
52  464
52  813

# THE UNION WATER COMPANY

*v.*

## JOHN KEAN, JR., FRANK BERGEN et al.

1. The act of the legislature, entitled "An act to incorporate the Union Water Company," approved March 17th, 1870 (*P. L. of 1870 p. 788*), created a corporation *in præsenti*, composed of the eleven corporators and commissioners therein named. The subscribing for five hundred shares of the capital stock and the payment of $5 on each share was not a condition precedent to corporate existence.

2. Notice, signed by all the corporators and commissioners, was duly given of the opening of books of subscription for the capital stock, under said act, for a day in July, 1870. But on the day named no one appeared, desiring to subscribe, except the eleven corporators, who agreed verbally among themselves to subscribe for and take one hundred shares each, and each gave his check for $500 to the treasurer of the commissioners as a first payment on account of his verbal subscription. A meeting of stockholders to elect directors was duly called and held, all the subscribers attending, at which directors were elected, who, in turn, elected officers. There were subsequent annual meetings of the stockholders attended by all the original corporators, at which directors were duly elected, also other meetings of stockholders, and also of directors, continuing up to 1875, when they ceased. The several checks, with one exception, were drawn against funds, in good faith, but were not used because no works were undertaken, and after some time they were returned to the drawers. The expenses of procuring the charter and of organization under it, and of subsequent proceedings, were assessed upon, and borne by, the stockholders equally; no indebtedness remained unpaid.—*Held*, that there was a corporation actually created, and a *de facto* corporate organization, which has a standing in this court.

3. In 1891, one of the defendants procured the signatures of six of the eleven corporators named in the act, to a call for subscriptions to the capital stock of the complainant at a day and place named, which was duly published. Before the day named, three of the subscribers to that call signed a paper revoking the call, and at the time fixed absented themselves from the place named for opening books. Two only of the six signers appeared at the time and place named, and, before any subscription had been made, notice was given to all present, on behalf of complainant, that three of the signers of the call had withdrawn their authority. Nevertheless, the books of subscription were opened, and more than $25,000 in stock subscribed by the defendants and an organization had by them.—*Held*, that the attempt to organize a corporation under this second notice failed—*first*, because the signers of the call were *func-*

*tus officii,* by reason of having signed the previous call and taken part in the organization of 1870; and *second,* because a majority of the corporators did not attend at the time and place fixed for opening the books, as required by the act.

4. The complainant, under these circumstances, is entitled to the aid of a court of equity to prevent the defendants, claiming to act under the organization of 1891, from proceeding to use the name of complainant or to exercise the franchise granted by the act, and the complainant is not restricted to the remedy by way of *quo warranto.*

5. *Quære*—Will a *quo warranto* lie at the relation of the corporation in this case against the defendants?

6. The power of a court of equity to deal with any matter brought before it, does not depend upon the nature or character of the issue to be tried or question to be determined, but rather upon the nature of the right to be administered and enforced, and the character of the remedy necessary and appropriate for its enforcement.

On final hearing on pleadings and proofs.

The bill is filed by an incorporated company against certain individuals who claim to act as its board of directors, and the prayer is that the defendants may be enjoined from receiving any subscription for any share or shares of the capital stock of the complainant; from issuing any receipt or certificate for any such share of stock; from calling in or receiving any moneys or installment on account of any share of such stock; from erecting or constructing any building or work, and from laying any water-main for the supply of water authorized under the act incorporating the complainant; from making any contract, in the name of the complainant, for the supply or use of water in the county of Union, in said state; from making any contract, in the name of the complainant, for erecting any of said work; from employing any workmen or laborers in the name of the complainant, and from doing or causing to be done any act or thing in the name of the complainant corporation or otherwise, whereby complainant, or the franchise or property thereof, or any stockholder of the corporation may be charged with any debt, contract or liability.

The bill in support of this prayer sets out the incorporation of the complainant by a special act of the legislature, approved

Union Water Co. *v.* Kean.

March 17th, 1870 (*P. L. of 1870 p. 788*), by which, in its first section, eleven gentlemen therein named,

"and all other persons who may hereafter be associated with them in the manner hereinafter provided, and their successors, shall be and are hereby constituted and declared to be a body politic and corporate, by the name and style of the 'Union Water Company,' and by that name shall have continual succession, sue and be sued, plead and be impleaded, answer and be answered unto, defend and be defended in all manner of actions whatever, have a common seal and make, change and alter the same at pleasure, and purchase, hold and enjoy such real and personal estate as may be necessary or useful for the object of this incorporation, or may be taken in payment of debts."

The same section provides that the capital stock shall be $50,000, divided into two thousand shares of $25 each, and that there shall be seven directors, stockholders of the corporation, who shall be chosen annually on a day named, after notice published in a newspaper. The act provides, in its second section, that the eleven persons named in the first section as incorporators shall be commissioners to procure subscriptions for the stock of the corporation, and that they or a majority of them "*may* open books for that purpose at Cranford," upon giving ten days' previous notice in a newspaper published in Union county, "and five dollars on each share of stock subscribed for shall be paid at the time of subscribing therefor, and the balance to be paid by installments from time to time;" and whenever five·hundred shares shall be subscribed for, the said commissioners shall call a meeting of the stockholders within sixty days thereafter, by giving fifteen days' notice of the time and place, in the county of Union, of such meeting, in a newspaper published in said county, for the purpose of electing directors and transacting other necessary and proper business; and when directors are elected the said commissioners shall pay over to them the money they shall have received, first deducting therefrom all expenses incurred by them;

"and all the powers of the said commissioners shall cease and be determined on the election of a board of directors, and the said directors or a majority of them shall have power, from time to time, to open the books for the further subscription of stock until the whole number of shares of stock is subscribed" &c.

The act, in its subsequent sections, gives power to supply the town of Cranford "and other places, in Union county" with water, and to contract with persons, companies, associations and corporations for the supply, use and preservation of water, and to erect, construct and maintain works and structures necessary or convenient to the purpose of this act, and to lay down pipes and other conduits, and to erect and construct hydrants and fire-plugs in the streets, alleys, lanes and other places, and to do all things necessary for supplying water as aforesaid. No power of condemnation is given, but the company is authorized to take water from the Rahway river near Cranford.

The bill proceeds to state that, pursuant to that charter, the commissioners gave due notice of opening books for subscriptions of stock on a day named, at Cranford hall, in the village of Cranford, and that thereupon, at the time and place named, the same eleven persons who were incorporated by the act subscribed for one hundred shares of $25 each, and paid the sum of $5 upon each share at the time of subscribing therefor, and no other persons subscribed, and that afterwards a meeting of the stockholders, to elect directors, was duly called, and that seven directors were thereupon elected, who, in turn, proceeded to elect Alden B. Bigelow as president of the corporation, F. A. Fisher as secretary, and S. Cahill, Sr., as treasurer; that those officers accepted their election and acted as such officers; that subsequently, in the year 1872, another election of directors was duly called by advertisement, and held, and a set of seven directors elected by which the same officers were elected president, secretary and treasurer respectively, and that they accepted their several offices and held them up to the year 1891, in August, when David Mulford, one of the directors, having died, James H. Partridge, one of the corporators, was elected in his place; Mr. Fisher, one of the directors, having resigned, Mr. Wilbur, then being a stockholder, was elected in his place; Mr. Purves having also resigned, Mr. Hegeman, a stockholder, was elected in his place, and that Mr. Foster, another of said directors, having resigned, Mr. Beadle, a stockholder, was elected in his place.

The bill proceeds to state that, notwithstanding this action, in

the month of June, 1891, six of the commissioners named in the act, viz., Messrs. Hamm, Fisher, Crane, Cahill, Sr., Cahill, Jr., and Purves, signed and published a notice for the opening of books of subscription for the stock of said company, at Cranford hall, on the 15th of July, 1891, at two o'clock in the afternoon. The bill further states that Fisher, Crane and Purves, three of the six so signing said call, before the 15th of July, and before any book of subscription was opened, by writing under their respective hands, withdrew their names respectively from the notice for that day, and withdrew and revoked all authority to act under or in their respective names in the premises, and notified the person who was active in procuring their signatures to the notice, of such withdrawal, and that on the 15th of July, at the time mentioned in the notice, at Cranford hall, in Cranford, only two of the commissioners who had signed the last-mentioned call were present, viz., Mr. Hamm and Mr. Cahill, Jr., and that the other four—Fisher, Crane, Purves and Cahill, Sr.—were not present, and that Mr. Bigelow appeared there in behalf of the complainant and notified the persons there present, including Messrs. Hamm and Cahill, that three of the commissioners who had signed the notice, viz., Messrs. Fisher, Crane and Purves, had withdrawn their names from the same, and that there was no authority for holding the meeting or for opening books of subscription; but that, nevertheless, the defendant Bergen, who was active in procuring the signatures to the notice and in conducting the proceedings, proceeded to open books of subscription, and that the defendants pretended, under subscriptions there had, to organize a company in the name of the complainant, and to act as such. And the bill further alleges that the persons acting under that authority threaten to collect money upon the subscriptions so made, to issue stock in the name of the complainant, to make contracts, construct and build water works and lay water-mains, water-pipes and conduits for the supply of water in the name of the complainant.

The bill charges that the company was finally organized in 1870 by the original incorporators and that it exercised its franchise of being a corporation many years; that by such action

the original corporators were *functus officii* and without power to call another meeting, and that if they had the power it required at least six of them to act in that behalf, and the withdrawal by three in writing of the authority to use their names, and the absence of all the commissioners except two at the time and place fixed, rendered all proceedings under the notice of 1891 absolutely void.

The answer admits the act of incorporation and the giving of the notice to meet on the 19th of July, 1870, but denies that anybody appeared or that any stock was subscribed for or proposed to be subscribed for at that time and place or at any other time, and asserts that no one paid any money or offered to pay any to any of the commissioners on account of any stock to be subscribed for, and that

"thereupon it was agreed between Bigelow, Purves, Cahill, Jr., Hamm, Partridge and others of the commissioners who were present that they would make an effort to acquire the powers, privileges and franchises proffered by the said act and to organize the said company by each agreeing to subscribe for one hundred shares of stock of the said company and each giving to Cahill, who was the treasurer of the commissioners, a check for five hundred dollars, upon the understanding and agreement then and there made between them that none of said checks should be paid or presented for payment, and that the sums of money therein mentioned should not be collected, and that the said parties agreeing to subscribe for said stock should not be called upon or required to pay the same or any of them, or any part thereof, or any sum of money whatever for or on account of the stock of said company until their further consent so to do should be given, but that the said checks should be held by the said Cahill until it could be ascertained whether or not capital could be obtained and a practical plan devised for constructing and operating water works in pursuance of said charter; that said checks should be returned to the persons who gave them in case efforts for the purpose were not successful, and that, in the meantime, a tentative organization of the said company should be made."

The answer then proceeds to state that the eleven corporators did each give to Cahill a check for $500, drawn upon banks, and took his receipt for the same, but that none of them signed any agreement to take stock in the company or bound themselves in any way to do so, nor was any written agreement to take stock in said company or legal subscriptions thereto made or effected;

that Cahill held the checks in pursuance of the agreement, and did not collect or attempt to collect the same or any of them, nor did any of the commissioners nor any of the directors collect or receive, nor did any of the parties giving their checks pay or offer to pay to Cahill or to any of the commissioners, any of the moneys for or on account of the stock of the company, and that no payment was ever made.

The answer further alleges that efforts were made to procure capital for the company, which were unsuccessful, and thereupon the enterprise was given up by common consent, the checks were returned to the persons who gave them, the efforts to organize the company wholly and altogether abandoned, and no further efforts were made from that time on until June, 1891, and that, prior to June, 1891, no organization of the company was ever effected or directors or officers elected, and that no sums of money were ever paid to any of the commissioners or any kind of property purchased, nor was any business transacted by or in the name of the Union Water Company, nor was any stock or certificate of stock of or in the name of the company ever issued; that no place of business was opened or kept, no mains were laid or water supplied or work of any kind done; that there was no visible sign of the existence of such a corporation, either in fact or in law, in the state.

The answer then sets out the notice calling for subscriptions of stock, signed by six of the commissioners, for the 15th of July, 1891, "and in pursuance thereof the said commissioners opened books to receive subscriptions to the capital stock of the said company, and kept the said books open for that purpose for two hours," at the time and place mentioned in the notice; that the defendants severally subscribed for divers shares of stock and paid $5 on each share, and that the total number of shares subscribed was five hundred and seven, and the amount of money paid, $2,535; that then, by agreement of all the subscribers, they met and appointed the defendants Hamm, Cahill, Sr., Cahill, Jr., Kean, Jr., Voorhees, Maguire and Bergen directors of the company, in the manner directed by the act; that the directors met and elected Mr. Kean president, Mr. Hamm treas-

urer and Mr. Voorhees secretary. The answer alleges corporate·
acts done under this organization, and does not deny that it,
intends to do what the bill charges in that behalf.

The bill was filed on the 12th of October, 1891.

*Mr. Abraham V. Schenck* and *Mr. Wilbur* (of New York), for·
the complainant.

*Mr. Richard V. Lindabury* and *Mr. Frank Bergen,* for the·
defendants.

PITNEY, V. C.

I. The first question is whether, admitting the facts set out in·
the bill to be true, and that the complainant has corporate exist-
ence under the proceedings of 1870, and is subject to the control
of the Bigelow party, who instructed the filing of the bill, a,
proper case is presented for the interposition of this court.

The defendants say there is not; that it is a proper case for·
the use of an information in the nature of a writ of *quo war-'
ranto* to inquire into and determine whether or not the defend-
ants were properly elected officers of the complainant, that such,
remedy is adequate, and that there is no occasion for the action
of this court.

In considering this question, it must be observed at the outset
that this is not a bill filed by certain persons claiming to be·
directors against others claiming to be directors, as was the case·
in *Owen* v. *Whitaker, 5 C. E. Gr. 122,* where this court declined
to exercise jurisdiction. The bill is filed by the corporation·
itself, and not by any individuals. Nor is the prayer for relief
in this case the same as in *Owen* v. *Whitaker.* There the prayer
was, *first,* that the treasurer of the commissioners as such should
be restrained . from paying over moneys in his hands to the
defendants as directors; *second,* to restrain those directors from
making calls on the stock. So far, there is some similarity in·
the prayers, but the further prayer of the bill in *Owen* v. *Whita-
ker* shows the dissimilarity of the actions; it was, *third,* to·
declare the election of those nine defendants void; *fourth,* to·

Union Water Co. v. Kean.

declare the nine complainants to have been duly elected directors; *fifth*, to declare the election illegal and to order a new election to be held; *sixth*, to direct that the commissioners at the new election should receive such votes only as should be determined legal; *seventh*, to direct the moneys received to be paid to the nine complainants claiming to be elected, or to such directors as should be chosen at such election as should be ordered, and *eighth*, that the defendants account for all moneys received or expended by them.

Here no judgment of the court is asked that the defendants are not directors of the complainant company, nor are they asked to account to the complainant for any moneys. The gist of the prayer is that the defendants be restrained and enjoined from enjoying the franchise granted to the complainant by the legislature, and from making it liable for any contracts. The case more nearly resembles that in *Johnston* v. *Jones, 8 C. E. Gr. 216,* where the bill was filed by Mr. Johnston and the Perth Amboy and Elizabethport Railroad Company as joint complainants, so that the corporation was the complainant, and the prayer was to restrain the defendant from interfering with work then being carried on by the complainant corporation, and from turning out of possession of the work a contractor under such complainant, and to prevent the defendants from taking control of the building of the complainant's road, and such relief was granted. Still more nearly does this case resemble that of *Van Dyke* v. *Stout, 4 Halst. Ch. 344.* That was a case of excessive subscription to the capital stock of a gas light company. The complainant had subscribed one thousand two hundred and fifty shares, one-half of the whole number provided for in the charter, and after the whole was subscribed and a day fixed for the election of directors, the commissioners, in order to wrest from complainant the control of the company, which he had acquired by his subscription, permitted further subscriptions, and, under pretence of apportioning the subscriptions, reduced the number allotted to the complainant. The voting for the election of officers proceeded upon this apportionment, and the board of directors so elected were enjoined, by Chancellor Halsted, from

proceeding to build the works contemplated by the act. It will be observed that, in that case, there was but one corporate organization, which was under the control of the defendants. There was no dispute between individuals as to which was duly elected, but the bill was filed by a stockholder to prevent persons who had a color' of title to the office of directors from exercising their powers in such a manner as to affect the rights and franchises of the company.

The case here is in marked contrast with that class of cases where the power of certain persons to represent a corporation as its directors and to act in the name of the corporation is challenged, and corporate existence and power are denied by third parties, as was the case in *Attorney-General* v. *Stevens, Sax. 369 ; Jersey City Gas Co.* v. *Dwight et al., 2 Stew. Eq. 242 ; National Docks Railway Co.* v. *Central Railroad, 5 Stew. Eq. 755,* and the *Elizabethtown Gas Co.* v. *Green, 1 Dick. Ch. Rep. 118.* In each of those cases the existence of the corporation was challenged.

Those cases also differ among themselves in that, in *Attorney-General* v. *Stevens,* by the terms of the charter of the Camden and Amboy Railroad Company, whose directors the defendants claimed to be, no corporation was called into existence until after a certain number of shares of stock had been subscribed. This distinction was pointed out by Chancellor Zabriskie in *Owen* v. *Whitaker, 5 C. E. Gr.* (at *p. 123*), and will again be referred to. So, in *Gas Co.* v. *Dwight, 2 Stew. Eq. 242,* the defendants claimed to be incorporated under the General Gas Company act. *Rev. p. 460.* The subscription for a certain amount of stock and the payment in good faith in cash of a certain percentage upon it was a prerequisite to the filing of the certificate of organization in the secretary of state's office, and that filing was, in turn, a prerequisite to the incorporation ; so that, until a certain amount of stock was actually subscribed and a certain amount in cash paid in on account of it, there could be no corporate existence. In the *National Docks Railway Case* the defendant corporation was organized under the General Railway act, which, like the General Gas act, requires that a certain amount of stock shall be subscribed and a certain amount paid in on it before the cer-

tificate can be filed, and such filing is a prerequisite to corporate existence, while in the *Elizabeth Gas Co. Case* the special charter under which the defendants claimed to be organized created the corporation by words *in præsenti*, and the subscription of stock and payment of money on account of it was not expressly declared to be a prerequisite. *P. L. of 1870 p. 247.* That case, as well as this, in this respect, resembles *Owen* v. *Whitaker*, where this difference is pointed out by Chancellor Zabriskie. He says that the charter of the Sussex Valley Railroad Company (*P. L. of 1867 p. 215*) incorporated the sixteen persons named as commissioners from the approval of the act.

In the case in *Saxton* it was held by Chancellor Vroom, and in the *National Docks Railway Co. Case* by the court of errors and appeals, and again by this court and the court of errors and appeals in the *Elizabeth Gas Co. Case*, that where the legislature had either created a corporation, as it did in the last-named case, or declared that one might be created under certain conditions, with certain powers under general laws, and those conditions had so far been colorably performed that there existed a corporation *de facto*, no private person or corporation could call that existence in question or deny the right of such corporation *de facto* to exercise the franchise granted to it by the legislature. The state alone can challenge such corporate existence and power to exercise the franchise granted. Such I understand to be the gist of what was decided in those cases. Some of the expressions of the judges may seem, on casual reading, to go farther in restricting the power of the court, but I do not understand the reasoning of the court, in arriving at that conclusion, to be that there is any disability in this court, as a court of equity, to deal with and determine any of the issues, either of law or fact, which are necessary to be solved in order to reach a proper conclusion in that class of cases, for the same disability, if any, will be found in a court of law. The supreme court has no more right than this court to set its machinery in motion at the suit of an individual to declare a corporation *de facto* to be no corporation. Such action can only be taken by the state through the attorney-general. *State* v. *Paterson and Hamburg Turnpike*

*Co., 1 Zab. 9.* In *Terhune* v. *Potts, 18 Vr. 218* (at *p. 221*), Judge Depue says :

" It is undeniable that this corporation was organized under the forms of law ; that it acquired existence as a corporation *de facto* and has been exercising corporate powers ever since the consolidation was effected, and that the applicant is seeking its dissolution by these proceedings as the means of enforcing rights personal to himself. The law is entirely settled that the court may grant leave to file such an information, at the instance of a private relator, against an officer of a corporation for an unlawful intrusion into an office on grounds affecting his individual title, although the same objections apply to the title of every other officer and member of the corporation and the application is incidentally, in effect, against the whole corporate body. *Rex* v. *White, 5 Ad. & E. 613 ; State* v. *Tolan, 4 Vr. 195 ; Field Corp.* § *457.* But when the proceeding is against certain individuals for claiming to act as a corporation, and its object is to try the legality of the charter and to determine the corporate existence of a corporation, it can be instituted only by the attorney-general as the representative of the state and in behalf of the state. For that purpose a private relator cannot have the use of this writ."

Much less will that court permit any collateral attack to be made upon such *de facto* corporate existence in the course of an ordinary suit at law. *Stout* v. *Zulick, 19 Vr. 599 ; Vanneman* v. *Young, 23 Vr. 404.*

The real ground and reason of the decisions in the line of cases now under consideration, is the lack of a complaint on the part of the proper and only party who has a right to complain, viz., the state, and not the want of capacity or ability in either court to deal with the question involved. In short, the power of this court to deal with any matter brought before it does not depend upon the nature or character of the *issue* to be tried or question to be determined, but it depends upon the *nature of the right* to be administered and enforced, and the *character of the remedy* necessary or appropriate to its enforcement. If the right to be enforced be one properly cognizable by a court of equity,

and the remedy necessary to enforce it be such as only a court of equity can administer, then a court of equity has jurisdiction, and the circumstance that, in the course of its administration, it has to deal with questions of law and fact, of whatever nature they may be, does not stand in its way. Thus, it may inquire into and determine as to the due execution of a contract for the conveyance of land for the purpose of compelling its specific performance, although ordinarily it cannot award damages for its non-performance, nor give judgment of possession in an action of ejectment to recover the land, but the inquiry as to such execution is precisely the same as would be that of a court of law in an action for damages for its breach. So with regard to a trust of lands, this court will inquire into and determine the execution of all the deeds and documents and all other matters of fact affecting the equitable title to lands, and will construe all such documents precisely as a court of law would do, and will determine, if the case warrants it, that while the legal title is in A the equitable title is in B, but it will not render judgment in ejectment in his favor. So in the course of its administration of equitable rights, it will deal with and determine questions of forgery and perjury and criminal fraud, though it will not exercise criminal jurisdiction to convict and punish the party guilty of either. It will prevent the fraudulent wrongdoer from enjoying the fruits of his wrongdoing, but will not otherwise punish him for his wrongful act, unless it involves a contempt of the court. So in cases of mistakes, in correcting them, it will inquire into all questions of fact and law which arise, precisely as a court of law would do in an action arising on the same facts. In fact, I know of no class of questions of fact or law which this court has not in the past and may not in the future be called upon to deal with, if necessary and proper so to do in order to administer an equitable right or apply an equitable remedy. And this was frankly admitted on the argument by counsel for the defendants.

I do not understand that the learned judge who spoke for the court of errors and appeals, in *National Docks Railway Co.* v. *Central Railroad Co., 5 Stew. Eq. 755,* intended to antagonize

this proposition when he said (at *p. 760*): "Not because this corporation threatens to assail any rights of the complainants, which, if lawfully organized, it would not be permitted to invade, but because it is a corporation *de facto* merely and not *de jure*, does the chancellor prevent it from doing what only a legal corporation may do. An *inquiry* and judgment of this nature are, we think, beyond the powers of the court of chancery, at least in a suit between private parties." Then after adverting to *Attorney-General* v. *Stevens, Sax. 369*, he says: "We think, therefore, that that court cannot deny to the National Docks Railway Company the powers granted by the General Railroad law, either because the money to be used for carrying on its works has come, or is designed to come, from improper sources, or because the chief use to be made of its railroad will be the transportation of the merchandise of the storage company." In reading these two extracts together, and reading both, as we must, in the light of the facts of the case and the precise point actually decided, I cannot conclude that the court intended, by the use of the word "*inquiry*," to decide that there is something so peculiar about the issue as to whether there be corporate existence *de jure* or not, that this court cannot grapple with it, if it becomes necessary so to do, in order to administer a well-recognized equitable right. What the court did decide in that case was that, when a railroad corporation has been regularly organized under the General Railroad law and has complied with all the prerequisites of the act, this court will not enjoin it from proceeding to condemn its right of way because the money paid in on stock subscriptions belonged to some corporation or persons other than those who appear as such subscribers.

In that very case the court of errors and appeals, on appeal from this court, did determine that the National Docks Railway Company was a corporation *de facto*, and I find it quite difficult to discriminate between an inquiry and a determination of the question whether a corporation does, in fact, exist as a corporation *de facto* and whether it is a corporation *de jure*, or whether it has no corporate existence whatever. It seems to me that the examination of either of those questions involves the exam-

Union Water Co. v. Kean.

ination of the other. The court in that case also decided that the act under which the defendant corporation was organized was constitutional.

Finally, in the very recent case of *The Proprietors of East New Jersey* v. *Force, 5 Dick. Ch. Rep. 784,* the complainants, claiming to be a corporation, filed their bill for an account against their former officer. He filed a plea denying their corporate existence. The complainants joined issue and went to trial on that plea before a vice-chancellor, who, upon evidence produced before him, found, as a matter of fact and law, that the complainants had corporate existence, and advised an order overruling the plea, and that finding and order were affirmed on appeal by the court of errors and appeals.

What I have said on this topic is a mere repetition, with elaboration, of what was said by Vice-Chancellor Van Fleet in *Mechanics' National Bank of Newark* v. *The Burnet Manufacturing Co., 5 Stew. Eq. 236.*

It is likewise in accord with the decision of the supreme court in *State* v. *Hann, 11 Vr. 229.*

The defendant in that case was indicted, tried and convicted in the quarter sessions for concealing a murder, and the question was as to the competency of that court to try the question of murder or no murder, the commission of which by a third person was a necessary element in the crime of concealing.

It was held that the court was competent to try it. At *p. 230,* the chief-justice says:

"The distinction is universally recognized between directly trying a criminal offence, in a direct proceeding against the offender, and inquiring into the same facts when brought into the case collaterally. Thus, in a civil suit founded on a writing, the question of forgery is a common issue, although the crime, as such, is beyond the jurisdiction of the tribunal.

"I am not aware of any legal question which the sessions has not the capacity to inquire into and to decide when such question is an incident of the case it has legally in hand."

I have said that in the four cases above cited, of which *Attorney-General* v. *Stevens* is the leader, the attack was made

on the corporate existence. In the case in hand there is no such attack. Both parties admit and claim that the corporation does exist, and the question is rather one of corporate succession. Now, this is a question which may be either of law or fact, or both, but it is by no means extraordinary or exceptional in any of its aspects, and has been frequently dealt with in this court as well as in the courts of law. It was so dealt with in the great case of *Hendrickson* v. *Decow, Sax. 577*, and again in *Doremus* v. *The Church, 2 Gr. Ch. 332.* In the first of these the dispute, which arose upon an interpleader, was as to the ownership of a fund, and that depended upon which of the two divisions of the great Society of Friends was the true successor of the original society. The second was a case of a foreclosure of a mortgage, and the defence was that the persons executing it in the name of the church had no authority so to do because they were not officers of the church and did not constitute its consistory. Chancellor Vroom examined and decided the question. At *p. 346* he says:

" In the case before me the question of the power of the consistory to execute the bond and mortgage must depend on the solution of another question, viz., whether they were in office or not at the time. According to the law of the church and the decisions of their acknowledged tribunals, I think there can be no doubt that they were in office. In the first place, they were lawfully elected and ordained, and thus formally inducted into office. They afterwards seceded, they renounced the authority of the classis and general synod, and at the very meeting at which the papers were executed they joined themselves to what was called the True Reformed Dutch Church. They no doubt did all they could to unchurch themselves, but they did not resign, nor did they, by any other act, divest themselves of their offices. This is evident from the course taken by the church, for, secondly, the church, after their renunciation, considered, treated and dealt with them as officers. In no part of the proceedings which took place in consequence of the secession were they considered as having vacated their offices."

The supreme court, in *Den* v. *Bolton, 7 Halst. 206*, examined

the same question arising out of the same church dispute. There was, as here, one religious corporation and two sets of trustees. The supreme court, in an action of ejectment, went into the merits of their respective titles to act as such, decided in favor of the plaintiffs and gave them judgment of possession.

The business of this court is, primarily, to deal with equitable rights, and whenever an equitable right is presented I shall, as before remarked, assume that this court has the power to deal with all the questions of law and fact necessary to establish and enforce it.

There is a numerous and familiar class of cases where the equity is based upon and arises out of a pure legal right, and the complainant's right to relief in this court depends upon his legal right being clear, the injury to that legal right imminent and the remedy at law inadequate and uncertain. The complainant contends that such is its position here. The defendants contend that the remedy by *quo warranto* is certain and adequate.

In considering this question we must proceed upon the assumption that the complainant was duly organized and became a full-fledged corporation in 1870 and has continued to be such under that organization ever since, and must bear in mind that the suit is by the corporation and not by individual contestants of an election.

The right and propriety of such suit being brought by the corporation itself is manifest, and was not contested by the defendants. All the stockholders of the corporation are interested in the question and will be affected by its solution. The effect of the continued exercise by defendants of corporate powers and franchises in the name of the complainant must be embarrassing, not to say disastrous, to the complainant. Surely, in such a case, the corporation ought to have in its own right a sure standing in some court, to be relieved against such an injury. It ought not to be at the mercy of mere personal contestants for the offices.

In some of its aspects the case resembles that of the unauthorized use of a trade-mark, or the name of a newspaper, such as was dealt with in the case of *Lane* v. *Smythe, 1 Dick. Ch. Rep.*

*443*.  Again, it somewhat resembles a case of false personation, where one man pretends to be another and makes contracts in his name.    Suppose the defendants had organized themselves into a corporation under the act of April 12th, 1876 (*P. L. of 1876 p. 103*), and had adopted the name of the " Union Water Company," the effect upon the complainant would have been sufficiently embarrassing, yet it would not have been so far-reaching in its effect as their present action, which goes to the extent of exercising the very powers and franchises granted to the complainant.

Now, the question arises, can the complainant, as relator, bring an action of *quo warranto* against the defendants to test their right in that behalf?    In other words, is the remedy at law certain ? Among the numerous instances of the use of an information in the nature of a *quo warranto*, under an act similar to ours, for the purpose of testing such questions, I have found none where the suit has been brought by the corporation itself.    All the instances, so far as I can find with the assistance of counsel, have been those where the suit was brought at the instance of an individual or individuals, and I can find no case in which a *quo warranto* at the instance of a corporation has been maintained upon such an act under circumstances like the present.

Then, again, what is the meaning of the word " franchise," in the act ?   Does it include the franchise to be a corporation ? The language of the act (*Rev. p. 905*) is :

" In case any person or persons shall usurp, intrude into or unlawfully hold or execute any office or franchise within this state, it shall and may be lawful to and for the attorney-general " &c.

Now, that act, so far as this part of it is concerned, is substantially a copy of the English act.    *9 Anne c. 20*.    The word " franchise," in that statute, has always been construed in the English courts to refer to the franchise of being a freeman of a municipality, and no more.   *High Extr. Rem.* § *602 ; Rex* v. *Williams, 1 Burr. 402*.   And the remedy of *quo warranto*, under that act, is there confined to municipal or public or *quasi*-public corporations.    *High Extr. Rem.* § *626 ; Shortt Inf. 129*.    Its

application to offices in private corporations had its origin in this country and arose in this wise: The first section of our act is a rescript of the fourth section of the English act, in which the word "*said*" offices or franchises is used instead of "*any* office or franchise," and that word "said," in the English act, refers to the preamble of the act which relates to municipal offices and franchises only. In other respects the act is, in substance, a rescript of the English act. Under the change resulting from the use of the word "any," in our act, instead of "*said*," our courts have held that our act applies to offices in trading corporations where the contest is between individuals, but my attention has not been called to any case where the word "franchise" has been so construed as to enable a trading corporation to maintain *quo warranto* in order to test the right of a set of men to exercise the franchises in its name.

It follows that, if the act complained of here be treated as, in substance, a seizure of the franchise of the complainant, then it is not entirely clear that it is within the *Quo Warranto* act.

Then as to the offices. I do not understand the complaint to be that the defendants have taken physical possession of the offices, which they claim to hold to the exclusion of the true officers, but, rather, that they have ignored the complainant's corporate existence and attempted to organize anew.

Is it, then, entirely clear that the complainant can, as relator, set in motion proceedings under the *Quo Warranto* act? I think not.

Then, as to the remedy at law, supposing it to exist. Is it adequate? It is probable that an action at law would lie by complainant against defendants for falsely alleging that they are the officers of complainant and entitled to control it, and for using a seal purporting to be the seal of complainant, but the damages in such an action would be uncertain and by no means compensatory. The right to use this particular name was given by the legislature, and although, in general, there is no property in a mere individual surname disconnected with matters of trade, yet it is manifest that a corporate name given by special charter, or one assumed in good faith by a company organized under

9

general laws, is an exception to this rule. And so it has been held, and courts of equity have frequently enjoined other parties from using a name so acquired. *Newby* v. *Oregon Railway Co., Deady 609; Holmes* v. *Holmes Manufacturing Co., 37 Conn. 278; London and Provincial Society* v. *London and Provincial Co., 11 Jur. 938; S. C., 17 L. J. (N. S.) Ch. 37; Croft* v. *Day, 7 Beav. 84; Holloway* v. *Holloway, 13 Beav. 209; Merchants' Banking Co.* v. *Merchants' Joint Stock Bank, L. R. 9 Ch. Div. 560 (1878); Guardian Life and Fire Insurance Co.* v. *Guardian General Insurance Co., 43 Law Times R. 791; 50 L. J. Ch. 253; Hendricks* v. *Montague, L. R. 17 Ch. Div. 638 (1881); High Inj.* § *1081; Morawetz Corp.* §§ *184, 413.*

In *London and Provincial Society* v. *London and Provincial Co.*, the preliminary motion for an injunction was indeed refused, but the case was held pending an action at law to be brought.

In *Holmes* v. *Holmes, 37 Conn. 278*, the complainant was organized under the name of "Holmes, Booth & Haydens," those being the names of the principal incorporators. A large number of persons afterwards became interested as stockholders in the corporation, and it did a successful business. Subsequently, Holmes, Booth and one Atwood, also a stockholder, sold out the greater part of their interest in this corporation and formed a new corporation, under the General Corporation act, under the name of the "Holmes, Booth & Atwood Manufacturing Company," and set up the same business as that carried on by the complainant in the same neighborhood, and upon a bill filed by the complainant to enjoin the defendant from doing business under that name, the injunction was issued. The cause was ably and elaborately argued, with an exhaustive examination of the authorities. In delivering judgment, Mr. Justice Carpenter (at *p. 293*) says: "It will be well to observe that the controversy in this case is between two corporations. Each party owes its existence to the law. The law authorizes, sanctions and protects every act done and every step taken in pursuance of law, either in the process of organization or in the course of its business. It is true, all the details are not prescribed in advance. Certain general powers are conferred which are ap-

Union Water Co. v. Kean.

plicable alike to all corporations, such as the power to hold property, to sue and be sued and the like. So, also, of certain requisites and forms, such as the par value of each share of stock, the publication of notice and recording the articles of association &c. Other powers and privileges are left, in a measure, to the discretion of the parties interested. Among these are the amount of capital stock, the location, the business to be transacted and *the name.* When the corporators have once exercised their power in respect to these matters, the law declares the capital stock, the location, the business and *the name* to be as thus determined until changed in pursuance of law. In respect to these matters, the corporation is as much the creature of, and subject to and protected by, the law, as in the former. *The law having authorized the selection of a name, and having declared the name so selected to be the name of the corporation, we see no reason why the law should not protect the corporation in the use of that name, upon the same principle and to the same extent that individuals are protected in the use of trade-marks.* Hence, it necessarily follows that corporations, in the exercise of discretionary powers conferred by the statute, must so exercise them as not to infringe upon the established legal rights of others." Again (at *p. 295*), after dealing with the right of the corporators interested in the defendants to use their individual names, he says: "But the difficulty with the argument is that the plaintiff corporation still exists, and the rights which others have acquired in the use of its corporate name are still outstanding. Until its dissolution, therefore, Holmes and Booth must use their own names, subject to the rights of the petitioners, unless relieved of that inconvenience by their consent."

In *Hendricks* v. *Montague, L. R. 17 Ch. Div. 638 (1881),* suit was brought by an unregistered life insurance company to prevent the registry of a new and rival company, and the application for a preliminary injunction was refused by Sir George Jessel, on the ground that the complainant's company was not registered. But that decision was reversed on appeal by the unanimous opinion of the three lord-justices, and the injunction

was issued on the ground that the defendants had no right to substantially appropriate the name of the complainant.

Again, suppose that the *quo warranto* will lie at the relation of the complainant, would the remedy thereunder be adequate? The supreme court has no power to enjoin the defendants, *pendente lite*, from acting in the name of the complainant, and such relief seems quite as important here as in a suit to restrain the use of a name. It is no answer to say that this court did not think proper, upon the filing of this bill, to grant an *interim* injunction. The question now is one of jurisdiction and adequacy of remedy at law.

There is another matter which seems to me not without weight. The defendants allege, but were not permitted to prove, that they have acted upon the organization under which they claim, and have, since bill filed, vested the title of valuable property in the complainant. If this be so, and the complainant should succeed in a *quo warranto*, the defendants would be obliged at last to come to this court for relief, whereas in this action, should the court decree relief to the complainant, it may be done upon terms that they hold the property vested in them by the act of the defendants in trust for the defendants.

In view of all these considerations, added to the weight of the two cases in this state, in which the jurisdiction has been sustained, viz., *Van Dyke* v. *Stout, 4 Halst. Ch. 344,* and *Johnston* v. *Jones, 8 C. E. Gr. 216,* I feel constrained, contrary to my first impression, to assume jurisdiction of this cause. In fact, I am convinced that the remedy by *quo warranto* does not meet the facts of the case.

II. The next question arises on an objection by the defendants to the standing of the complainant in this or any court. It is alleged that the complainant never was organized as a corporation by the Bigelow party, and never had corporate existence until that existence was initiated by the defendants in 1891. This requires an examination of the facts.

In 1869, nine gentlemen, residents of Cranford, citizens of substance and interested in the welfare of that village, formed an association called " The Rahway River Water Works Asso-

ciation." The first meeting of which a record was kept was held on the 22d of November, 1869, and there were then present seven members, viz., F. A. Fisher, A. B. Bigelow, W. D. Bigelow, Sylvester Cahill, Sr., Nathaniel G. Foster, Alexander P. Purves, Sylvester Cahill, Jr. The association was organized by the election of A. B. Bigelow as chairman, F. A. Fisher as secretary, and Sylvester Cahill, Sr., as treasurer. At that time it appeared that a charter was being prepared and provision being made for an application to the legislature for incorporation. Another meeting was held on the 5th of January, 1870, and an assessment of $10 on each of the members was made to pay the expenses, and a committee appointed to attend to getting the charter. Another meeting was held on the 1st of February, 1870. The members of the association, up to that time, were as follows: F. A. Fisher, A. B. Bigelow, Sylvester Cahill, Jr., N. G. Foster, W. D. Bigelow, S. Cahill, Sr., Benjamin F. Hamm, James H. Partridge and Alexander P. Purves; and on that day, February 1st, David Mulford, John G. Crane and Phineas P. Lounsbury were admitted members, making twelve in all, and all were required to sign certain articles of association. Another meeting was held on the 15th of February, 1870, at which the committee on the charter reported that they had employed counsel to argue their application before the house committee, and report was made of the amount of money received and paid out by the treasurer. A further assessment of $50 on each member was made, if necessary to procure the passage of the charter. Another meeting was held on the 15th of March, and an assessment of $60 on each member was made, and the cost of procuring the passage of the charter was estimated at $700. The act of incorporation was approved March 17th, 1870, and eleven of the twelve members of the association were named as incorporators, Mr. Lounsbury being omitted. Another meeting of the association was held on the 20th of April, after the passage of the charter. The treasurer reported that he had received $1,020, and paid out $1,270.65 from the commencement of the organization, and a further assessment of $25 on each member was made to cover the amount expended in obtaining the charter and leave

a balance in the hands of the treasurer, and a committee was appointed to investigate what could be done to carry out the object of the charter in connection with other parties.    Another meeting was held on the 27th of April, 1870.    Seven members only were present.    Again another meeting was held on the 5th of July, at which seven members only were present.    The treasurer reported that he had paid out more money than he had received, and a claim for a further indebtedness of the association was presented.    It was then resolved that notice be given under the charter for the opening of books of subscription on the 19th of July.    Notice was duly published of the opening of books of subscription, at Cranford hall, in Cranford, on the 19th of July, at eight o'clock in the evening.    This notice appears to have been signed by all the corporators and commissioners.    On that day, July 19th, but whether at the hour named or not does not appear, there was a meeting of the association, at Cranford hall, at which Messrs. Fisher, A. B. Bigelow, Foster, Partridge, Purves, Mulford, Lounsbury, Cahill, Sr., Cahill, Jr., Crane and Hamm were present, being all of the twelve members, except W. D. Bigelow, and comprising ten of the eleven incorporators.    At this meeting it was resolved that each member of the association subscribe for one hundred shares of the capital stock of the Union Water Company.    The proofs do not show that any actual formal subscription of stock was ever made, though space seems to have been left for it in the minute-book, and at the meeting of the association held on the previous 5th of July, it was resolved that Mr. Hamm should act with Mr. Fisher, the secretary, in preparing the necessary book for subscription, and the omission of the actual subscription may have been due to the failure of those two persons to prepare an actual contract of subscription.    Be that as it may, the associates seem to have contented themselves with immediately giving their several checks, eleven in all, for $500 each to Mr. Cahill, Sr., as treasurer of the commissioners.    By some understanding or misunderstanding which is not explained, Mr. W. D. Bigelow, who was not present at this meeting of July 19th, took and gave his check for the shares which Mr. Crane agreed to take, and afterwards in

1872, and again in 1873, Mr. Crane claimed admission as a stockholder of the company. Immediately after this meeting of July 19th, notice was given under the charter for a meeting of the stockholders for organization, and such meeting was held pursuant to the notice on August 7th and the organization completed by the election of seven directors, who in turn organized by the election of A. B. Bigelow as president, F. A. Fisher as secretary, and S. Cahill, Sr., as treasurer. The funds, consisting of the eleven checks for $500 each and possibly a few dollars in cash, were formally transferred from the treasurer of the commissioners to the treasurer of the corporation, and then, by special resolution, the same were taken from the hands of the treasurer and placed in a safe deposit vault, in New York city, belonging to one of the directors. These checks were so held for some time, but were subsequently handed back to each of the drawers. At a meeting of the directors held in July, 1871, the treasurer reported that $110 had been assessed against each stockholder, twelve in number, amounting to $1,320, and that $1,255 had been collected, leaving a balance uncollected of $65. This appeared to be due from Mr. Fisher, and was remitted to him for his services, and an additional assessment made on the stockholders of $159. This latter assessment appears to have been paid by a portion at least of the stockholders.

Another election of directors was held in 1872, resulting in no change of the *personnel* of the board of directors, at which committees were appointed to investigate and report upon the feasibility of constructing water works and the merits of different plans. These committees appear to have spent some time and money in such investigations, with the general result that no feasible plan was discovered which was within the pecuniary ability of the company, and for that reason the several checks for $500 each were returned to the several stockholders. As a thin excuse for this action, it is stated on the minutes that the checks were handed back in payment of services by the stockholders.

With regard to the sum assessed and actually collected and expended, it seems probable that a large portion of it was

expended in procuring the charter and other incidental expenses incurred by the association prior to the organization under the charter. I think this is fairly inferable from the several reports made by the treasurer. The directors seem to have felt justified in treating moneys so expended as a part of the indebtedness of the corporation, and payments made by the several associates on account of it as payments on account of their stock. In fact, they treated the charter as an incorporation and continuation of the previous association.

From 1874 or 1875 to 1891 this organization seems to have been quite dormant, no meetings being held and nothing being done. Seven of the eleven persons who gave their checks for $500 each, in 1870, were sworn as witnesses at the hearing, and the clear weight of their evidence is that, with a single exception, the checks were drawn in good faith, against funds, and would have been paid if the company had need or occasion to use the money. It was, however, thought by the stockholders that it was useless to draw the money and keep it lying idle while they were maturing their plans, and seeking other capital to join them in their enterprise, and so the checks were retained and saved with care until it appeared that there was no prospect of any immediate action.

The stockholders were acting in perfectly good faith and with an actual intention to construct works if they could. Their good faith in this behalf was freely admitted, during the taking of the testimony, by counsel of the defendants.

The attack upon the complainant's corporate existence is based on two grounds—*first,* that there was no actual subscription in writing to the capital stock; *second,* that there was no cash paid in, in good faith. Both of these acts were claimed to be necessary prerequisites to any corporate existence.

Let us examine this question, and in so doing bear in mind that it is not now a question whether or not the complainant corporation had progressed so far as to be authorized to break the ground and lay water-pipes in the streets of the village of Cranford, but whether it had corporate existence. *Morawetz Corp.* § *19.* This, it seems to me, must be a matter of construction upon

the reading of the charter itself; and reading that, in the face of the admitted facts in regard to the existence of the previous voluntary association of which mention has been made, I think there can be no doubt as to the result. The language is that the eleven gentlemen

" and all other persons who *may* hereafter be associated with them in the manner hereinafter provided, and their successors, shall be and are hereby constituted and declared to be a body politic and corporate, by the name and style of 'The Union Water Company,' and by that name shall have continual succession, sue and be sued, defend and be defended in all manner of actions whatever, have a common seal and make, change and alter the same at pleasure, and purchase, hold and enjoy such real and personal estate as may be necessary or useful for the object of incorporation or may be taken in payment of debts;"

and it then proceeds to say that the stock shall be deemed personal property and shall consist of $50,000, divided into two thousand shares of $25 each.

Now, that language gives corporate life to the persons named *in præsenti*. It differs in that respect from many charters, some of which declare " that the persons who shall subscribe to the stock in manner hereinafter provided shall be and are hereby declared to be a body politic and corporate." Such was the charter of the Camden and Amboy Railroad Company, which declared in its second section that when five thousand shares were subscribed for " the persons holding the same shall be and they are hereby incorporated into a company by the name of the Camden and Amboy Railroad and Transportation Company," and such subscriptions were to be taken by the five gentlemen named in the first section as commissioners. There, clearly, there was no corporate existence until a certain amount of stock was subscribed.

Such appears to have been the tenor of the act under consideration by Chancellor Walworth, in *Walker* v. *Devereaux, 4 Paige 229* (at *p. 245*). The act now under consideration resembles the charter of the Sussex Valley railroad (*P. L. of 1867 p. 215*), which was before Chancellor Zabriskie in *Owen* v. *Whitaker, 5 C. E. Gr. 122*, before alluded to, in which he held

that the act created a corporation *in præsenti*. The act does not say that the corporate life of the corporation depends upon there being any other persons associated with the incorporators besides themselves. In the second section it declares that the eleven persons named as corporators " shall be commissioners to procure subscriptions for the stock of the said corporation, and they, or a majority of them, *may* open books for that purpose," at Cranford, upon giving certain notice, and further, that $5 on each share of stock subscribed for shall be paid at the time of subscribing for them &c., and that

" whenever five hundred shares shall be subscribed for, said commissioners shall call a meeting of the stockholders for the election of directors and transacting other business."

It does not say that the subscription shall be in writing, or that the $5 on each share shall be paid in actual cash or in any particular kind of money, and, in this respect, it is in contrast with the charter of the Metropolitan Gas Light Company of Elizabeth (*P. L. of 1870 p. 247*), which, while it declares that the nine persons named shall be a corporation, proceeds to provide that four of them—not the whole or a majority, but less than a majority—shall be commissioners to receive subscriptions for stock, and that the five per cent. to be paid when each share is subscribed shall be paid in legal tender of the United States. Nor does this act declare by express terms that any particular amount of money must be paid in before it shall proceed to the transaction of business and the laying of pipes, although, as before remarked, that, here, is not the question. It is to be observed that it not only creates the eleven gentlemen, comprising the whole of the original voluntary association, a corporation, but it requires that a majority of them shall act in receiving subscriptions, thus giving the actual control of the corporation to the eleven gentlemen named, and the provision for the payment of $5 in money may well have been inserted for the purpose of protecting the minority of the eleven against the acts of the majority in receiving improper and unreliable subscriptions of stock.

The object of the corporation is in marked contrast with that of banking corporations, where the public at large is to be protected against bogus financial institutions which gain the confidence of the public and receive their money on deposit in trust, and where the existence of an actual cash capital is of the utmost importance.  In such cases, however, it is usual to insert a clause in the charter that the business of banking shall not be commenced until a certain amount of money has been paid in, in good faith.  No such provision is found in this charter.

Chancellor Zabriskie did not cite any authorities for his *dictum* as to the construction of the charter of the Sussex Valley railroad, but it is supported by what I think the great weight of authority.

In *Minor* v. *The Bank, 1 Pet. 61,* the supreme court of the United States had under consideration the charter of the defendant bank, passed the 16th of May, 1812.   There the enactment was

" that the subscribers to the Mechanics' Bank of Alexandria, their successors and assigns, shall be and hereby are created and made a body politic, by the name and style of the 'Mechanics' Bank of Alexandria,' and by such name and style are hereby made able and capable in law to have, purchase &c. lands" &c.

Then the second section provides that the capital stock of the corporation *may* consist of $500,000 &c., and the argument was that the word "may" must be construed to be *must,* and Justice Story held that it did not mean "must," and that the subscription of the whole amount of the capital stock was not a conditional prerequisite to its corporate existence, unless made so by the terms of the charter.

In *Brouwer* v. *Appleby, 1 Sandf. 158,* the corporate existence of the Croton Insurance Company was called in question.   There the first section of the act in question declared that eleven persons named and "all other persons who may hereafter associate with them in the manner herein prescribed *shall be a corporation* by the name of the Croton Insurance Company;" and in the second section it was enacted that the persons named in the

first section were appointed trustees &c., and then it was provided that the company should be clothed with all the powers and privileges and made subject to all the restrictions &c. granted to, and imposed upon, the Atlantic Mutual Insurance Company by the act incorporating that company; and, by the third section of that act, the trustees were directed to open books to receive applications for insurances, and after such applications, to be approved by them, amounting to $500,000, had been received, the book of application might be closed and the company might be organized, and it was objected that the company never was properly organized. Of this objection, Chief-Justice Oakley (at *p. 168*), after reciting the previous sections of the act, says: "The seventh section of that charter [Atlantic Mutual Insurance Company] made it the duty of the trustees to open a book for applications for insurances, and after receiving such applications, to be approved by them, amounting to $500,000, the book might be closed and the company might be organized.

"Thus, the company was fully created a body corporate by the charter, and vested with various powers. The trustees named in this act were to do certain things to organize the institution, *but their omission to do them did not affect the rights of the company or its corporate existence.*"

*Vermont Central Railroad Co.* v. *Clayes, 21 Vt. 30,* was an action on a promissory note given to commissioners appointed by the legislature to receive subscriptions to stock of the Vermont Central Railroad Company. The charter of that company was somewhat like that of the Camden and Amboy Railroad Company, and declared that the corporation should consist of the persons who should subscribe to the stock. The learned judge (at *p. 35*) says: "The more important question would seem to be, can the present plaintiffs maintain an action on this note? It is said the corporation was not *in esse* at the time of making the promise. If this be so, it would be difficult to get over that objection. But the first section of the plaintiffs' act of incorporation declares in express terms that such persons as shall thereafter become stockholders of said company are constituted a body corporate &c. Though it is necessary that every corpo-

ration should have corporators, yet we find, by the fourth section of the act, that every subscriber for stock becomes, *per se*, a corporator; and by the subscription paper, which is made a part of the case, it appears that there were several subscribers for stock prior to the defendant's becoming one. Each subscriber for stock *per se* becomes a member of the corporation, and all, as fast as they subscribe, become corporators under the provisions of the act. To justify an organization of the corporation, certain things are made necessary, but in the eye of the law this corporation should be regarded *in esse* before they have the right to organize. *It is the statute which creates the subscribers for stock a corporation, and not their organizing under it.* It is usual, in acts of incorporation, to designate the names of certain individuals as corporators, but that was not done in this instance. As the act incorporates all that shall thereafter become stockholders, it may be taken, for the purpose of giving vitality to the charter of incorporation, that the defendant, as well as other subscribers for stock, became such on the day the act of incorporation passed, although in point of fact they did not subscribe until some time subsequent. If this be not so, the charter must, at all events, have vitality from the time individuals became stockholders in point of fact, by an actual subscription, and this is sufficient for present purposes."

*Hughes* v. *Parker, 20 N. H. 58,* was a bill in equity by a stockholder in a company against certain persons claiming to be the directors of the company, to prevent their proceeding to act as such, the allegation being that they were not properly elected. The charter there was like that in *Owen* v. *Whitaker,* in that it created the persons named, called "grantees," and their associates, successors and assigns, a body corporate; and the vice alleged there, as here, was that they never did open any books for subscription or have any associates, but assumed to be the corporation, having elected directors from among themselves. On this point the chief-justice uses this language: "He [complainant] says, in the first place, that the grantees could not legally have elected directors without first having made or taken to themselves associates. But this position cannot be main-

tained. *The grantees and their associates form the corporation. If there are no associates then the grantees compose the corporation.* The corporation may consist of them or they may associate others with themselves in the exercise and enjoyment of the rights and privileges conferred by the act, or they may wholly assign its benefits to other parties. But the act does not require them to do either. Its benefits belong to the grantees, or to the grantees and their associates, or to their assigns; and if they do not choose to receive associates there is no ground for complaint any more than there would be·if they did not see fit to assign those benefits. The authorities cited by the defendants' counsel are in. point and confirm the obvious construction which they have given to the act of incorporation."

That language applies with force to the present case. The complainant's charter does not compel the corporators to open books of subscription and take other associates with them, but says that they may do so, and, as before remarked, the formalities requisite on the taking in of outside stockholders may well have been designed merely to protect the original grantees of the franchise, and if they, as they did, agreed among themselves to take sufficient stock to authorize the election of directors, to wit, five hundred shares, their corporate existence was not thereby affected.

In *Stoops* v. *The Greensburgh and Brookville Plankroad Co., 10 Ind. 47,* the defendant, a corporation (plaintiff below), sued Stoops (defendant below) to recover the amount of his subscription to its capital stock, and one of the defences set up was that the subscription was void because it was made before the directors named in the act of incorporation had organized by meeting and electing a president and secretary. Mr. Justice Hanna says:

" This company was incorporated by an act approved January 15th, 1849, the first section of which constitutes Hiram Carmichael and five other persons a body corporate and politic, by the name &c., with the usual corporate powers to sue and be sued. The second section styles those named in the first, directors, and requires them to open books for the subscription of stock at such time as they may think best. The fourth section

adopts, as a part of the company's charter, several sections of an act passed in 1847, to incorporate the Greensburgh &c. Turnpike Company.   Among the sections adopted is the third, which requires the directors to meet and organize by electing one of their number president; another clerk and treasurer.  The appellant's position is that, until the directors had met and elected officers, the corporation had no legal existence, and no valid subscription could be made, for the want of mutuality and because there was no promisee.   To this position there are several answers—1. The first section of the charter declared the directors named a corporation *ab initio*.   The requirement concerning the organization of the company was merely directory.   *Judah* v. *American &c. Insurance Co., 4 Ind. 333.*   *   *   *   3. The corporation having become, by virtue of its charter, a legal entity, the failure to perform any act prescribed in the charter would not terminate its existence.   That end can be attained only by a direct proceeding."

In the same direction is the case of *Frost* v. *The Frostburg Coal Co., 24 How. 278.*

The line of cases relied upon by defendant in opposition to this view will be found, upon examination, to have dealt with enactments varying in their provisions from that before the court.   Thus, in *Walker* v. *Devereaux, 4 Paige 229,* as already observed, the act, like that in *Attorney-General* v. *Stevens, Sax. 369,* incorporated those who subscribed to the stock upon the books opened after notice by commissioners, and provided that if there was an excess of subscription over the amount fixed by the charter, the commissioners should distribute it.   Such excess was subscribed, and Chancellor Walworth expressed the opinion —not necessary to the disposition of the motion before him— that until there had been a valid distribution and apportionment of the stock among the subscribers there were no stockholders and no corporate existence.   But he says (at *p. 245*): "If the whole corporate stock, and no more, had been subscribed,   *   *   *   then those persons who had thus subscribed and paid their money   *   *   *   would have acquired legal rights as corporators."

This view was adopted by the supreme court of New York in *Crocker* v. *Crane, 21 Wend. 211.* That was an action by the endorsee against the drawer of a check given in lieu of cash upon a subscription to the stock of a railroad under a charter similar to that in *Walker* v. *Devereaux,* and, as in that case, there was an excess of subscription and an attempted distribution and apportionment, which the court held invalid, and hence also held that there was no corporation.

These cases will serve as an example of many others cited which have no application, because dealing with enactments different from that here in question.

The dissenting opinion of the court of errors and appeals in the *Elizabeth Gas Co. Case,* reported in *4 Dick. Ch. Rep. 329,* is relied upon by defendants in support of this part of their case. As it was not concurred in by a majority of the court, I feel at liberty to examine its reasoning, premising, however, that the question there was whether the defendant company was so far organized as to have acquired the right to lay down gas-mains in the streets of Elizabeth, a question, as we have seen, not quite the same as that here involved, which is merely whether the complainant has such corporate existence as to enable it to bring an action in a court. Looking at the case in that light, it seems to me that the learned judge overlooked the distinction between the charter of the gas company, in the *Elizabeth Gas Co. Case,* and the provisions of the general act for the incorporation of gas companies, under review in the *Jersey City Gas Co. Case, 2 Stew. Eq. 242.* The one, as already pointed out, creates a corporation *in præsenti,* and the other requires certain prerequisites to be done before corporate existence commences.

Numerous authorities were cited by the defendants in their briefs herein, to the effect that any person, affected by the operation of parties claiming to be incorporated under general laws, could challenge their corporate existence on the ground of nonperformance of the statutory prerequisites.

I conclude that complainant had corporate existence from the start, sufficient for present purposes. And, having arrived at that conclusion, it would naturally be in order to inquire as to

the defendants' right to challenge it, but before doing so let us consider the defendants' other objections, and inquire whether complainant had corporate organization as well as existence.

And first, as to there being no actual subscription. It was a conceded fact that no persons, other than the twelve members of the old association, applied at the time and place fixed by the commissioners, or at any other time or place, for stock in the company. The corporators made honest and earnest, but unsuccessful, endeavors to induce other persons to join them in the enterprise. There is no question here of unfair apportionment of subscriptions, or of contrivance to prevent opportunity to subscribe. The public had all, and more than all, the opportunity to participate in this franchise which the legislature contemplated. Nor is there any serious dispute, as between the corporators, as to how the stock should be divided among them. They agreed upon an equal division, so far as it was divided. Neither of them was prevented from having all he desired. The only appearance of dispute was as to the claim of Mr. Crane for a standing as a stockholder, and that does not seem to have assumed a serious aspect. The corporators seem to have been entirely unanimous in their action, all acquiesced in what was done, and each gave his check under the circumstances above stated. The single apparent exception was Mr. Hamm, who swears that he gave his check, purposely drawn on a bank where he had no account, to Mr. Cahill, upon the express understanding, privately agreed upon between them, that Mr. Cahill was not to use it without his consent. He does not deny his agreement to subscribe or that he knew that the other checks were given upon a different understanding. Under the circumstances, it is plain that this secret understanding was a fraud upon his associates, and would not have availed him if occasion had arisen for the use of the funds.

Now, what was the effect of what was done? It seems to me clear enough that each of the checks was good, so that the drawer could have been compelled to pay it whenever called upon by the complainant, acting by its directors, so to do. As among themselves the transaction amounted to a payment, and as such

10

to a ratification of the subscription by oral vote. As among themselves, it made each one a stockholder. Neither could deny the other's standing in that respect. The amount required by the charter having thus been subscribed, none of the corporators could deny the right of the stockholders to organize by an election of directors. This was, in fact, done, a regular organization kept up for years and endorsed and approved by all the stockholders.

But the validity of all this is attacked on various grounds. It is said that the checks were given without consideration and in fraud of the requisites of the act, and were, therefore, void. As to the consideration, they were given for a present interest in the corporate franchise and a prospective interest in the property of the corporation, and besides this all-sufficient consideration there was that of mutuality. *1 Pars. Cont. (5th ed.) 452.* All the associates having consented to take checks instead of cash, neither would be permitted, as before remarked, to defend them on the ground that the law required their payments to be made in cash, if such be its true construction. To permit them, or either of them, to set up such a defence would be to permit them to set up their own wrong. The leading case relied upon by the defence on this point is *Union Turnpike Co.* v. *Jenkins, 1 Cai. 381; S. C. on error, 1 Cai. Cas. 86.* That was an action at law on a subscription of stock, and the defence was that the defendant had not paid anything in cash at the date of the subscription, as required by the statute. This defence was overruled in the supreme court by Justices Kent and Radcliff, Chief-Justice Lewis dissenting, and judgment given for the plaintiff, which was reversed on error, but this result has never been satisfactory either to bench or bar. Mr. Cook (*Cook Stock.* § 174) says: "This decision has been distinguished, questioned and doubted by the courts." And his criticism is sustained by the cases cited by him and by several others which I have seen. The opinion of the supreme court, concurred in by Judge (afterwards Chancellor) Kent, seems to me to be sound, and its reasoning not to have been met by the opinions on error.

*Crocker* v. *Crane, 21 Wend. 211,* was, as above stated, an action

upon a check given as cash for a subscription to the stock of a corporation, and the action was defeated because the corporation, as the court held, never had corporate existence.   The learned judge, however, speaking of payment by checks (at *p. 220*), used this language: " I do not deny that receiving an occasional check might have been a fair substitute.   But checks being crowded on the commissioners in a mass, because no subscriber had anything but uncurrent money to pay, is another matter. The commissioners might as well have received anything else which an accommodating construction would call an equivalent for cash.   But the statute did not allow a mere equivalent.   It would not, for instance, have recognized a mortgage or stocks as a payment, of whatever 'value.   The commissioners were here acting ministerially, and if they have not pursued the purposes of the statute their acts cannot be sustained.   I am, therefore, strongly inclined to the opinion that the check in question was void, as contrary to the policy of the statute.   Nor can there be any doubt, I imagine, that the contemplated corporation, if I am right as to the facts, failed of going into existence for want of the proper payments as a *condition precedent.*   Such is the doctrine laid down by Chancellor Lansing in *Jenkins* v. *Union Turnpike Co., 1 Cai. Cas. 94, 95,* and recognized by this court in *Goshen Turnpike Co.* v. *Hurtin, 9 Johns. 217,* and *Dutchess Cotton Manufactory* v. *Davis, 14 Johns. 238.*   These cases go farther.   Each subscriber must pay as a condition to his own liability attaching.   Payment was a requisite which the commissioners could not waive.   *Starr* v. *Scott, 8 Conn. 483.*"

This ruling was adopted by the Supreme Court of Pennsylvania in *Hibernia Turnpike Co.* v. *Henderson, 8 Serg. & R. 219,* in an action on the subscription itself.   But I submit that the dissenting opinion of Mr. Justice Duncan (at *p. 228*) is more in accord with reason and sound policy than that of the majority. These cases have been doubted and questioned and distinguished, and it has been held in Pennsylvania that if a stockholder attended meetings and voted as such he waived the defence. *Erie and W. Plankroad Co.* v. *Brown, 25 Pa. St. 156 ; Clark*

**v.** *M. Navigation ·Co., 10 Watts 364;* and see on the subject generally, *Cook Stock.* §§ 172, 175. In section 173 he says:

"The decided weight of authority and the most carefully considered cases hold that a subscriber for stock cannot escape the responsibilities of a stockholder by showing that he never paid the percentage or fixed amount required by charter or statute to be paid at the time of subscribing. He will not thus be permitted to take advantage of his own wrong and default to the prejudice of others. In some instances the percentage was paid in notes or checks instead of cash; in others, payment in cash was made at some period subsequent to the act of subscribing; in still others, no payment at all was made on the subscription, and suit was brought for the whole amount. In England a failure to pay such a percentage is held not to affect the liability of the subscriber, but to restrict his right of transferring his stock."

The same doctrine is announced by Mr. Morawetz in his treatise on *Corporations* §§ *134, 135.* He says:

"It may be stated as a general rule, that if a person has agreed to become a stockholder in a corporation and has enjoyed the benefits and privileges of membership, he cannot, when called upon to perform the obligations of his contract, set up as a defence that the corporation was not legally organized or that he did not comply with the requirements of the law in becoming a member. * * * For similar reasons it has been held that a stockholder might be estopped by his conduct from setting up, as a defence to an action for calls, that the number of shares required by law to authorize the corporation to be formed have not been subscribed. A subscriber for shares before the incorporation of a company cannot be held liable upon his subscription until the company has been incorporated in the manner provided by law. But if the company organizes as a corporation without authority of law, and the subscriber acts as a shareholder, he will become liable as a shareholder by reason of his conduct, although the requirements of the law have not been fulfilled. The same rule applies where formalities are required to be observed in making stock subscriptions or in creating new members of a corporation already formed. Thus, a person who has been received as a shareholder and has acted as a shareholder cannot, when called upon to contribute the amount of his shares, set up as a defence that he failed to pay the preliminary deposit required by law in making his subscription."

And again, in sections 267 and 268:

"It has likewise been held that if the subscribers actually organize themselves as a corporation and engage in business, they will be estopped, as between themselves, from denying the validity of their contract, though it be unauthorized by law; and the want of authority in the agents receiving the

Union Water Co. v. Kean.

subscriptions to receive them without payment of the prescribed deposit will thereby be cured.  In other cases, however, *it has been held that a provision in an act of incorporation requiring the payment of a deposit upon each share subscribed was not intended for the benefit of the public and did not impose a condition precedent to the incorporation of the company, but that it was intended for the benefit of the company alone* and for the purpose of providing a fund out of which the expenses of the preliminary organization might be paid.  Under a law of this character, a subscription made without the payment of the deposit would not be illegal.  It might be refused by the other subscribers or the corporation acting on their behalf, on account of the non-performance of a condition upon which membership was offered ; but if the corporation should accept the subscription without the payment of the deposit, the subscriber would not be entitled to deny the validity of his contract."

These views seem to me to be sound.  Here, although there was no formal subscription in writing, there was a verbal agreement among each of the eleven corporators to take one hundred shares each ; and such agreement was evidenced by the giving of their several checks for the amount of the down payment. Such checks amounted, under the circumstances, to a subscription, and were accepted by common consent as the payment of the down money.  Each person afterwards exercised his rights as a stockholder by repeatedly voting at meetings for directors and for other purposes.  The directors so elected organized in the ordinary way and acted as such.  Their action was repeatedly approved by the stockholders.

It was further contended by the defendant that this organization was abandoned and cannot now be claimed to be in existence.  I do not understand the mere quiescence of the enterprise to have that effect.  But if the point were well taken it would be fatal to the defendants, for the only possible result would be a surrender of the franchise to the state.  But I do not think that such is the result here.  *Rose* v. *Turnpike Co., 3 Watts 46 ; Slee* v. *Bloom, 5 Johns. Ch. 367 ; Phillips* v. *Wickham, 1 Paige 590 ; Russell* v. *McLellan, 14 Pick. 63 ; Morawetz Corp.* §§ *635, 637 ; Ang. & A. Corp.* § *771.*

Again, it is said that the non-payment of the actual cash was a fraud upon the law.  This was the point taken and urged in the *Elizabeth Gas Case,* and not concurred in by the majority of the court of errors and appeals.  But I am unable to under-

stand who has been defrauded, for, as so often observed, this is not a question of the right of the complainants at present to lay down mains in the town of Cranford, but their right to hold and continue their corporate existence under their charter; and so long as the State of New Jersey does not interfere, I am unable to see what right the defendants have to take the point of fraud.

After the organization of the defendants, under which they claim, and before the bill was filed, the complainants renewed their corporate action by calling in more money, electing new directors and by paying to the State of New Jersey the corporation tax for eight years, namely, from 1884 to 1891, inclusive.

I come, then, to the conclusion that not only was there a corporate existence from the start, but the corporation took form in 1870 and was duly organized by the election of directors, who were recognized by the stockholders as such, so that there was a *de facto* organization, and the directors so elected had the right to institute this suit.

III. But the complainant, in turn, attacks the defendants' organization and charges that the proceedings under which they claim are without value.

Let us consider the facts. The defendant Bergen, in 1891, was interested in a water-supply company whose source was at Netherwood, on the Central railroad, near Plainfield, about ten miles from Elizabeth. The Elizabeth Water Company was looking for an additional supply, and all parties desired a corporate organization, with power to lay mains in the streets and roads between Netherwood and Elizabeth. Cranford is on the Central railroad, about half way between those places. Mr. Bergen found among the statutes this old charter of the Union Water Company, and, upon inquiry of several of the corporators, learned some of the facts above stated, but not all, as the minute-book was mislaid and was not found until after the organization carried out by him. He applied to several of the corporators and obtained the signatures of six, namely, Messrs. Hamm, Cahill, Sr., Cahill, Jr., Purves, Fisher and Crane, to a notice of opening books of subscription to stock of the company

Union Water Co. *v.* Kean.

at Cranford hall, on July 15th, 1891, at an hour named.  The six commissioners were not present together when their signatures were affixed, nor did they ever meet and consult about the affair.  All was done through Mr. Bergen, who either saw them personally or corresponded with them.  Mr. Fisher was a confirmed invalid in body and mind, being paralytic and imbecile. Before the day named in the notice, three of the signers, viz., Messrs. Purves, Fisher and Crane, withdrew their signatures to the notice by formal and explicit writings signed by them.  Mr. Bergen had immediate notice thereof, and one of the three persons so withdrawing—Mr. Purves—wrote a letter directly to Mr. Bergen, withdrawing his name from the paper signed at the request of the latter.  Nevertheless, Mr. Bergen appeared at the hour and place named with the book of subscription already prepared, but of the six signers of the call only Messrs. Hamm and Cahill, Jr., were present.  The door of the hall was not opened, and the proceedings took place on the porch.  There was some conflict of evidence as to what occurred on this occasion, but all serious doubt was set at rest by the evidence of Mr. Davey, who was present and was called as a witness by the defendants, after having had his memory refreshed by listening to the examination and cross-examination of previous witnesses. Taking his evidence in connection with that of the other witnesses, I find the following to be the facts: Mr. A. B. Bigelow, president of the complainant corporation, whose office was near Cranford hall, was on the alert at the hour named in the call for subscriptions.  Nobody appeared at the precise hour, nor for some minutes after.  He thereupon thought the call was abandoned, and was absent for a few minutes.  On his return he found several gentlemen there—Mr. Bergen, Mr. Cahill, Jr., Mr. Hamm, a Mr. Brunsom and Mr. Davey.  Nothing in the way of subscription had as yet taken place.  The books had not been produced or opened.  Mr. Bigelow then and there, and before any subscription, stated openly, so that all could hear, that three of the persons who had signed the call had withdrawn their signatures and authority, and that the proceedings were, therefore, illegal, and would not be acquiesced in, but would be

contested.  He swears that he spoke as president of the old organization, and although he was not supported in that assertion by Mr. Davey, still it is plain from all the circumstances that he was understood by all present to speak in behalf of an older organization.  An animated and somewhat acrimonious discussion occurred between Mr. Bigelow and Mr. Bergen, and it is not surprising that all of it was not remembered.  Mr. Bigelow seemed to have forgotten, when on the stand, that he had left the ground for a few minutes to produce the written withdrawals of the three dissentient commissioners, and Mr. Bergen seems to have forgotten that it was prior to Mr. Bigelow's second appearance, and not prior to his first appearance on the ground, that the subscriptions were made.  All those present had full and direct notice before subscribing that only two of the six commissioners making the call were then present, and that three of them had formally withdrawn their signatures and authority for the call.  But in addition to the notice so given by Mr. Bigelow, Mr. Bergen had, as I have already said, notice of the withdrawal of the three, and also a letter direct from Mr. Purves distinctly withdrawing his name from the call which he had previously signed at the request of Mr. Bergen, and Mr. Bergen says he mentioned that fact to the defendant Kean before July 15th, the day of the subscription, so that Mr. Kean had notice of it.  Mr. Bergen also had notice of the organization of 1870, and as he was evidently acting in concert with Mr. Kean, who was president of the Elizabeth Water Company, it is fair to infer that he also informed Mr. Kean of that organization. There were five hundred and seven shares subscribed for on July 15th.  Of these, Mr. Bergen subscribed for two hundred, and Mr. Kean, by Mr. Davey as his attorney, subscribed for two hundred; Mr. Davey also subscribed for seventy-seven other shares for divers individuals, all under one letter of attorney, which he swears was handed to him by Mr. Kean.  It is evident, then, that both Mr. Bergen and Mr. Kean, to say nothing of the others, are chargeable with notice not only of the absence and withdrawal of three of the six commissioners who signed

Union Water Co. *v.* Kean.

the call, but also of the fact that these persons, or some of them, had years before taken some measures for organization.

Upon these facts complainant contends, *first,* that the persons signing the call of 1891 were *functus officii* by reason of having signed a call in 1870 and having acted upon it ; *second,* that no legal subscription could be made under the charter without the presence of a majority of the commissioners.

I am of the opinion that both points are well taken.   It is proper to remark just here that it does not lie in the defendants' mouth to say that this is requiring of them a more strict compliance with the provisions of the act than was required of the old corporation, since their only right depends upon the failure of those corporators to properly organize, and that failure depends upon the want of strict observance of the terms of the act.   In other words, I am applying to defendants no stricter rule than it is necessary to apply to all parties in order to give the defendants the least standing.

The eleven grantees of the franchise named in the first section of the act are, by the second section, made commissioners to procure subscriptions to the stock, and authorized to open books upon giving notice &c.,

"and whenever five hundred shares are subscribed for, the commissioners shall call a meeting of the stockholders by giving fifteen days' notice &c., for the purpose of electing directors &c., and when directors are elected the said commissioners shall pay over to them the money they shall have received, * * * *and all the powers of the said commissioners shall cease and be determined .on the election of a board of directors,* and the said directors, or a majority of them, shall have power, from time to time, to open the books for further subscriptions" &c.

As already shown, all this was gone through with in 1870, due notice of opening books was given, subscriptions, or what all parties treated as subscriptions, to the amount of over five hundred shares were subscribed, what all parties treated as a payment of $5 per share was paid, an election of directors was held pursuant to due notice, a board of directors duly elected by the stockholders, and the money turned over to them by the commissioners.   These directors served as such, and were again

elected.  Whatever defects may be pointed out in the original organization, it nevertheless did exist and was recognized by every commissioner.  Certainly neither of the six gentlemen who signed the later call can be heard to say that the prior proceedings were so far faulty as to be absolutely void.  They certainly cannot be heard to say that they did not then exercise the power given by the act, and if they exercised it then they cannot exercise it anew.

Then as to the second objection.  The delegation of power to open books is to the commissioners, *or a majority of them.* Power is not given to a majority to give notice, and to a portion of that majority to open books, but the books must be opened by a majority.  That means that the majority must be present whenever such subscriptions are actually made.  I can perceive no other function for the word "majority."  The reason of this, however, is obvious.  The grant of the franchise was to the eleven corporators "and all other persons who may hereafter be associated with them in the manner hereinafter provided."  But, as before observed, the legislature probably intended to protect the grantees of the franchise from sharing it with other persons not grateful to them, and therefore provided that the books should be opened and subscriptions received by a majority of them.  Now, not only was a majority not actually present in person, but they were not there potentially or constructively by reason of their signing a call, for they withdrew their signatures and thereby said, "we do not desire that this call shall be proceeded with."  That action on their part seems to me to be fatal to the defendants.

But it is said by defendants that the commissioners, having once signed the call, could not withdraw their signatures, and that their presence was not absolutely necessary, the receipt of the subscriptions being a mere ministerial act.

The cases cited by the defendants in favor of this view were cases of meetings of the subscribers for the election of directors, not a call for subscriptions to stock.  After subscriptions to stock have been made in any legal manner the subscribers have rights.  They have the right to meet, and may all meet by com-

mon consent, as they did in the defendants' case, without notice,, and it is beyond the power of the commissioners to defeat that right. It was so held in *Hardenburgh* v. *Farmers' and Mechanics' Bank of New Brunswick, 2 Gr. Ch. 68*, and it was upon that especial ground that the decision was put.

The same criticism applies to the case of *Newcomb* v. *Reed, 12 Allen 362*, cited by the defendants. There, in pursuance of the then prevailing fashion and practice in Massachusetts, the stock of a corporation was formally subscribed for before the charter was granted, and that instrument did not provide for opening books for subscription to the stock, but simply incorporated those who had already subscribed, and provided that they should meet for organization by election of directors and officers upon a call to be made by certain persons named. It was held that, where the corporators who were already stockholders met by common consent, in pursuance of a defective notice, elected directors and completed their organization, such organization could not be attacked collaterally, and that the persons taking part in the organization could not set up a defective organization as a defence to an action brought against them individually by reason of their being stockholders. The case was, in effect, precisely the same as that of the New Brunswick bank. Neither has any application here.

The defendants were unable to prove that, prior to the filing of the bill, they had actually entered into any contracts or taken any irretrievable steps in the name of the Union Water Company, and I held at the hearing that they were not entitled to set up anything that they had done after the date of the filing of the bill and service of the subpœna, except that they had continued their formal corporate existence.

There can, therefore, be no estoppel in the case.

A consideration of the case as a whole seems to me to show that the original corporators were originally the owners of this franchise. They invested their money in it. If, in 1891, it had not been surrendered, but still existed, it belonged to those corporators, and the attempt on the part of the defendants to seize and appropriate it was without either merit or legal value.

I will advise a decree that the defendants be enjoined from exercising the franchise granted by the act incorporating the complainant, and from using its name for any purpose whatever.